**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Fred STARK et al., Respondents.**

**No. 22, Docket 74–2658.**

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1975.

Decided Nov. 5, 1975.

Certiorari Denied March 22, 1976. See 96 S.Ct. 1463.

423

Grant Morris, N. L. R. B., Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Allison W. Brown, Jr., N. L. R. B., Washington, D. C. of counsel), for petitioner.

Charles R. Katz, New York City, for respondents.

Before FRIENDLY, TIMBERS and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order against

employers dated September 6, 1974, 213 NLRB No. 38. The employers are Fred Stark (a family partnership composed of Fred Stark, Harold Stark and Rita Stark) and two affiliated corporations, Jamaica 201 St. Corp., Inc. and Jamaica 202 St. Corp., Inc., all engaged in the ownership and rental of commercial and residential buildings and properties. We shall refer to all three as "respondent." The order found that respondent had violated § 8(a)(3) and (1) of the National Labor Relations Act by the discriminatory discharge of, and refusal to reinstate, six employees, Charles Thompson, Roger Evans, Wayne Huff, Jeffrey Maksymchak, Felipe Ortiz and George Peters, and had violated § 8(a)(1) by the coercive interrogation and warning of Peters and another employee, Kenroy Bishop, and by offering to reinstate Maksymchak if he left his union. The order contained the usual provisions for ceasing and desisting and notice posting, and for the providing of reinstatement and back pay to the six discharged employees.

## I.

The story begins with respondent's signature, on April 17, 1973, of a contract with Local 32B, Service Employees International Union, AFL–CIO, the charging party herein (hereafter the Union), relating to a property not here involved. News of this led Peters, a foreman for respondent, to arrange for an organizational meeting in his apartment on April 30. The meeting was attended by Peters, Thompson, Evans, Huff, Maksymchak, Ortiz, and Bishop, all employed by respondent, and by a Union organizer. Each of the seven employees signed an authorization card. The Union requested recognition by letter dated May 8, which respondent received on May 10.[1]

Four of the six discharges occurred on May 11. The day began with Harold Stark's sending Thompson, Evans and

Huff to remove debris from a building under renovation and haul it away. During or shortly after the lunch hour, Thompson suggested that more men were needed, the others agreed, and they drove to respondent's office to ask Harold Stark to provide them. Stark was not there and the three employees sat in the truck to await his arrival. They were joined by Maksymchak, a part-time student employee who had recently reported for work and had been told by Harold Stark's secretary, Karen Gsell, to await Stark's arrival so that he could be given his work assignment. The four moved to Maksymchak's station wagon; he announced he was not feeling well and did not think he would work that afternoon. Stark soon arrived and asked Maksymchak whether he was going to work that day. Maksymchak answered in the negative, saying that he did not feel like working. Stark thereupon discharged all four for being drunk.

This was the version given, with slight variations, by the four employees, all of whom denied being drunk or, indeed, having had anything to drink. Stark testified that all but Maksymchak were drunk; that when he asked why the three had not finished the assigned job, Thompson answered that they weren't doing it and Huff that they were done with it; that he discharged the three for being drunk and not working; and that he told Maksymchak that if the latter didn't want to come to work, he was fired too.

Maksymchak further testified that on the next day he sought reinstatement; that Harold Stark asked him why he had joined the Union which was "like stabbing me in the back," and told him to wait a few weeks; and that on a later occasion Stark said he could have the job back if he got out of the Union. Stark did not specifically deny these incidents,

[1]. Respondent claimed that it employed 18 maintenance workers during May, 1973; counsel for the Board disputed the precise number. The original charge issued against respondent alleged a violation of § 8(a)(5) as well as § 8(a)(3) and (1); the § 8(a)(5) charge was dismissed prior to the hearing on the basis that the Union did not represent a majority of the employees.

although he made a general denial of discussing the Union with any employee.

Peters testified that on May 14 Fred Stark (Harold Stark's father) said he had just fired four of Peters' men because they had joined the Union; that Fred Stark was surprised at Peters' having joined because "you're supposed to be my foreman"; but that Stark said he would forget it, and told Peters to go back to work with a warning to "just stay away from the union." Fred Stark did not take the stand. Harold testified that he was with his father at the time of the alleged conversation and that it had not taken place; Peters, by contrast, had testified that Harold was inside a building when Fred spoke to him.

On May 15 Peters told Fred Stark he would not be in on the following day since he had been spitting blood and was going to the Veterans' Administration Hospital. According to Peters, Fred told him to stay away from the Union. In fact, Peters, had had no intention of going to the hospital; instead he took Thompson, Evans, Huff and Maksymchak to the Union to make out affidavits concerning their discharge. According to Peters, Fred Stark fired him the next morning because Peters wouldn't "learn." Again Fred did not testify but Harold, who heard the May 17 conversation, quoted his father as saying only "You are a liar and I don't trust you. You weren't at the VA Hospital when you said you were . . . You are fired."

Meanwhile, Ortiz had been discharged on May 16. Unable to speak English intelligibly and having difficulty even with an interpreter, he made the somewhat bizarre claim, corroborated, however, by two other witnesses, that Harold Stark had fired him for disobeying an order to pick up dog stools with his hands rather than get a shovel and broom. Harold Stark denied Ortiz's story; his version was that Ortiz refused to clean out litter, including the dog stools, on the ground that this was not his job.

The final episode consists of a statement allegedly made by Harold Stark to Bishop shortly after Peters' discharge on May 17. According to Bishop, Stark said that he had already fired all the other card signers and that Bishop must "give up on the union because it won't come in here." Stark did not deny this except for his general disclaimer of having discussed the Union with employees.

One other piece of evidence should be mentioned. At some date, unhappily not identified, Fred Stark called Larmond, an official of the Union, about the Union's letter demanding recognition and asked what it was "all about." Stark also inquired who had signed the cards. Larmond gave "two or three names," to which Stark replied, "Oh, I fired them. They're all drunk, and I fired them."

## II.

■ The Administrative Law Judge (ALJ) well summarized the situation when he said:

> As is apparent from the foregoing recital, the case revolves substantially around credibility resolutions. If the substance of the General Counsel's testimony is accepted the complaint is substantiated. If the substance of the testimony of the Respondent is accepted the complaint falls. It seems apparent that, in a number of instances, there must be deliberate falsification of testimony by one side or the other. It is not possible that there could be honest misunderstanding with respect to some of the incidents.

In upholding his findings that the General Counsel's witnesses were credible and that Harold Stark was not, the Board followed its "established policy not to overrule an Administrative Law Judge's resolutions with respect to credibility unless the clear preponderance of all the relevant evidence convinces us that the resolutions are incorrect," citing *Standard Dry Wall Products, Inc.*, 91 NLRB 544 (1950), *enforced,* 188 F.2d 362 (3 Cir. 1951). We in turn have long been committed to the view that we will not upset a decision of the Board

> when it accepts a finding of an Examiner which is grounded upon (a) his

disbelief in an orally testifying witness' testimony because of the witness' demeanor or (b) the Examiner's evaluation of oral testimony as reliable, unless on its face it is hopelessly incredible or flatly contradicts either a so-called 'law of nature' or undisputed documentary testimony.

*N.L.R.B. v. Dinion Coil Co.,* 201 F.2d 484, 490 (2 Cir. 1952) (Frank, *J.*) (citations omitted). Both these sound positions rest, however, on the assumption that correct procedures have been followed in making the credibility findings. Respondent contends that assumption is unwarranted here.

At the outset of the hearing respondent's counsel moved for sequestration of witnesses "because in this case there will be a very sharp issue of credibility involved"—the sequestration to include the six alleged victims of discriminatory discharges. The ALJ stated he was prepared to grant the motion except for these six, since in his view "[t]he Board's uniform practice has been not to apply the rule to those persons." Respondent's counsel, stating that his real aim was to sequester the four men discharged on May 11, then rejected the ALJ's offer of sequestration-in-part.

The first credibility issue determined by the ALJ in his decision was the reason for the terminations of Thompson, Evans, Huff and Maksymchak on May 11. The issue whether three of these former employees were drunk was a sharp one, and respondent's case that this was the cause for the discharge was strengthened by the fact that the incident would seem to have preceded the telephone call in which Larmond gave "two or three names" and Fred Stark responded "[t]hey're all drunk, and I fired them." The ALJ resolved the credibility issue against respondent.

Had this been a court trial involving ordinary witnesses, it would have constituted a classic case for sequestration—a principle whose lineage is traced back to Daniel's effective cross-examination of the elders who traduced Susanna, see 6 Wigmore, Evidence § 1837 at 347–48 (3d ed. 1940), and whose high standing in the law of evidence is attested by the quaint practice of referring to it simply as "the rule." The questions for us are whether a court should require the NLRB to apply "the rule" to unfair labor practice proceedings and, if that question be answered affirmatively, what significance should be given to the fact that particular witnesses are alleged discriminatees.

### III.

Section 10(b) of the National Labor Relations Act, as enacted in 1935, 49 Stat. 449, 454, provided that "the rules of evidence prevailing in courts of law or equity shall not be controlling." The Taft-Hartley Act significantly altered this to read, 61 Stat. 136, 147 (1947):

> Any such [unfair labor practice] proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States    .    .    ..

This change reflected the same attitude that led Congress to alter the substantive standard of judicial review from the formulation of the Wagner Act, § 10(e), 49 Stat. 449, 454 (1935), "The findings of the Board as to the facts, if supported by evidence, shall be conclusive," to that of the Taft-Hartley Act, § 10(e), 61 Stat. 136, 148 (1947), "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."[2] The § 10(b) amendment

---

2. The history of these substantive changes was authoritatively described by Mr. Justice Frankfurter in *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 476–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951). It is to be noted, however, that, in contrast to the provision concerning judicial

originated in the House of Representatives, and the Committee Report submitted by Representative Hartley makes clear that it was directed at what was perceived to be the same evil, an inability of the courts of appeals to require that Board determinations conform to fact, as the proposed amendments to § 10(e). H.R.Rep.No.245, 80th Cong., 1st Sess. 40–42 (1947), *reprinted in* N.L.R.B., Legislative History of the Labor Management Relations Act, 1947, at 331–33 (1948). Although the Senate seems to have concurred in the House's amendment to § 10(b) on the basis that this merely restated current Board practice— see 93 Cong.Rec. 6602 (1947) (remarks of Sen. Taft), 2 Legislative History, *supra,* at 1542—and because the phrase "so far as practicable" left the trial examiner considerable discretion—see 93 Cong.Rec. 7002 (1947) (remarks of Sen. Taft), 2 Legislative History, *supra,* at 1625—the legislative history in the House—see also H.R.Rep.No.510, 80th Cong., 1st Sess. 53 (1947), 1 Legislative History, *supra,* at 557, U.S.Code Cong.Serv. 1947, p. 1135— amply justifies the view that § 10(b) was intended to make clear that courts of appeals have the power to review evidentiary rulings in unfair labor practice proceedings, and that it is for the judiciary to determine how closely those proceedings must conform to the procedures used in the district courts. Other courts of appeals have, without much discussion, apparently adopted this view; see, e. g., *N.L.R.B. v. Capitol Fish Co.,* 294 F.2d 868, 875 (5 Cir. 1961); *General Engineering, Inc. v. N.L.R.B.,* 341 F.2d 367, 374 (9 Cir. 1965). Clearly "the rule," which is not an exclusionary principle, compare Davis, Administrative Law Text 271–76 (1972), but a simple and time-tested method for helping to discover the

truth, would rank high in a list of evidentiary doctrines which courts, under § 10(b), should enforce upon the NLRB. The very fact that witnesses in such proceedings, as in others, will very likely have discussed their proposed testimony with counsel and among themselves heightens the importance of preserving an opportunity for the adverse party to develop inconsistencies.[3]

Even before the tightening effected by the Taft-Hartley Act, the Board had received two judicial instructions with respect to application of "the rule." In *N.L.R.B. v. Quality & Service Laundry, Inc.,* 131 F.2d 182, 183 (4 Cir. 1942), *cert. denied,* 318 U.S. 775, 63 S.Ct. 831, 87 L.Ed. 1144 (1943), a distinguished panel (Parker, Soper and Dobie, *C. JJ.*) advised, in a per curiam opinion, that in courts of law the issue whether or not witnesses are to be separated "is a matter resting in the sound discretion of the trial court" and that the same principle "should be applied to hearings before the Board or its examiners." Shortly thereafter, Judge Florence Allen, writing in *N.L.R.B. v. Burke Mach. Tool Co.,* 133 F.2d 618, 621 (6 Cir. 1943), put the matter more positively:

> The breadth of the Board's power emphasizes the importance of striving for that atmosphere of perfect impartiality which is so much to be desired in any hearing to settle controversial issues. Rulings as to the reception of evidence and the general conduct of hearings should not only keep within the bounds of broad discretion necessarily imposed upon the trial examiner but also reflect an endeavor to impress the employer, as well as the employes, that every reasonable effort has been made to enable all parties to present

review, the rules of evidence provision of the Taft-Hartley Act cannot be read in tandem with the Administrative Procedure Act, which has different provisions. See 2 Davis, Administrative Law Treatise § 14.08 at 285–86 (1958).

**3.** The effect of failure to sequester the discriminatee witnesses was heightened by the ALJ's novel view:

If there was fabrication, it would seem more probable that it was the one, rather than the four, who was lying. It is, of course, possible that the testimony of four can be contrived, and that of one truthful; however, the likelihood of perjury or mistake becomes more remote in direct, or even geometrical, proportion to the number of persons who testify to a fact.

their theory of what has transpired. In the present case, the respondent seasonably moved for a separation of witnesses as soon as it appeared that the testimony of witnesses called by the Board would be inconsistent with that of Rockwell. This motion was denied and testimony of various employees who had listened to similar testimony given by others was received over respondent's objection. These rulings undoubtedly hampered effective cross-examination of the Board's witnesses by the respondent. Since the testimony presented a serious conflict on several material points, the effect of the course adopted upon public confidence in the fairness of the proceedings was unfortunate. While we think the rulings did not constitute such an abuse of discretion as to require denial of the petition for enforcement of the order, the refusal to separate witnesses was nonetheless improvident.

In *Shartle Brothers Machine Co.,* 60 NLRB 533 (1945), the Board noted these decisions and said that while "it would have been better practice to have granted motions for the separation of witnesses," denial was not prejudicial error. This language was repeated in *The National Lime and Stone Company,* 62 NLRB 282, 284 n. 5 (1945), a case which included a discriminatory discharge.

So far as we have been able to determine without the aid of adequate briefing, the *fons et origo* of the Board's doctrine that "the rule" was not to be applied to alleged discriminatees because they "were not mere witnesses at the

hearing" but "in effect, they occupy the status of complainants" was *Jaques Power Saw Company,* 85 NLRB 440, 443 (1949).[4] This has been followed in a long line of cases: *Lewis Karlton,* 91 NLRB 1295 n. 3 (1950); *Walsh-Lumpkin Wholesale Drug Co.,* 129 NLRB 294, 296 (1960), enforced, 291 F.2d 751 (8 Cir. 1961) (per curiam order); *Donald L. Trettenero,* 129 NLRB 610 n. 1 (1960); *T.I.L. Sportswear Corp.,* 131 NLRB 176 n. 1 (1961), enforced, 112 U.S.App.D.C. 252, 302 F.2d 186 (1962) (no discussion of sequestration); *Sopps, Inc.,* 189 NLRB 822 & n. 4 (1971).[5]

In light of this substantial body of precedent, the ALJ was fully justified in saying that "[t]he Board's uniform practice has been not to apply the rule to [alleged discriminatees]." Since he clearly and correctly thought he had no discretion under Board practice, it is impossible to sustain the first position taken by Board counsel, namely, that the ALJ was exercising discretion and did not abuse it. Although the Board is on considerably stronger ground in its alternative argument that its flat rule prohibiting the sequestration of alleged discriminatees in § 8(a)(3) proceedings is sustainable, this is not ultimately persuasive.

Despite Wigmore's position that sequestration should be demandable as of right when sought in good faith, 6 Evidence § 1839 (3d ed. 1940), the principle in the federal courts prior to enactment of the Federal Rules of Evidence, 88 Stat. 1926, effective July 1, 1975, was that it was grantable in the discretion of the trial judge. See, e. g., *Kaufman v.*

---

4. The Board sought to buttress its position by saying "the Respondent does not allege that [the witnesses'] testimony was improperly influenced in any way by their unrestricted presence in the hearing room, nor has the Respondent shown any substantial prejudice resulting therefrom," citing the two courts of appeals cases and its own decision in *National Lime and Stone Company.* The Board did not discuss the effect of the 1947 amendment of § 10(b).

5. A somewhat different approach was taken in *Rickert Carbide Die, Inc.,* 126 NLRB 757 n. 3

(1960). There, in sustaining refusal to sequester two discriminatees, the Board said:

The determination whether witnesses should be excluded from a hearing is a matter within the discretion of the Trial Examiner. We find no abuse of discretion in this case especially in view of the fact that the two whom the Respondent would exclude filed the unfair labor practice charges in this proceeding. As persons filing a charge, each was a "party" within the Board's Rules and entitled to participate fully in the hearing.

*United States,* 163 F.2d 404, 408 (6 Cir. 1947), *cert. denied,* 333 U.S. 857, 68 S.Ct. 726, 92 L.Ed. 1137 (1948); *United States v. Postma,* 242 F.2d 488, 494 (2 Cir.), *cert. denied,* 354 U.S. 922, 77 S.Ct. 1380, 1 L.Ed.2d 1436 (1957); *Williamson v. United States,* 310 F.2d 192, 198 (9 Cir. 1962); *Taylor v. United States,* 388 F.2d 786, 788 (9 Cir. 1967). The question of the excludability of "parties" had presented a problem, with most courts and statutes tending against exclusion but with some going the other way. See 6 Wigmore, Evidence § 1841 at 364–65 (3d ed. 1940) and 1972 Pocket Supplement at 161 notes 9 and 10. Now Rule 615 has adopted Wigmore's principle of mandatory exclusion:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.

but with the following equally mandatory qualification:

> This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

While, as in this case, discriminatees are not usually "parties" within NLRB Rules and Regulations, 29 CFR § 102.8 (1974),[6] since they leave the filing of a charge to their union, there is nothing to prevent their joining in such a charge and we agree with the Board that decision with respect to sequestration should not turn on whether they have done so in a particular case. On the other hand, despite the recognition accorded to charging parties in *International Union, United Automobile, etc., Workers, etc. v. Scofield,* 382 U.S. 205, 217–21, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965), an unfair labor practice proceeding under § 8(a)(3) is not the exact equivalent of a private suit. The complaint is issued by the Board acting through the regional director, 29 C.F.R. § 102.15 (1974), and when he has done so "and the proceeding reaches the adjudicative stage, the course the hearing will take is in the agency's control." 382 U.S. at 219, 86 S.Ct. at 382. In this case, as often happens, no lawyer appeared for the charging party and the proceeding was conducted solely by counsel for the General Counsel on the one hand and counsel for the respondent on the other. Under such circumstances one of the main reasons claimed for the "party" exception, the need for his presence to guide his own attorney, has diminished force. The interest of counsel for the General Counsel, like that of an Assistant United States Attorney, is—or should be—not that he "shall win a case, but that justice shall be done," *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 655 (1935). Beyond that, the judicial decisions that developed the "party" exception scarcely took into account the situation that frequently occurs in § 8(a)(3) proceedings where several employees may be testifying to a single event on one side, whereas the other side is presented by a single witness or, if more than one, by officials or supervisory employees who are not "parties" and can thus be put under "the rule." To the contrary, it seems that in many jurisdictions which generally refused to compel sequestration of "parties," the term was given a restricted scope when the presence of the witness

---

**6.** The term "party" as used herein shall mean the regional director in whose region the proceeding is pending and any person named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in any Board proceeding, including, without limitation, any person filing a charge or petition under the act, any person named as respondent, as employer, or as party to a contract in any proceeding under the act, and any labor organization alleged to be dominated, assisted, or supported in violation of section 8(a)(1) or 8(a)(2) of the act; but nothing herein shall be construed to prevent the Board or its designated agent from limiting any party to participate in the proceedings to the extent of his interest only.

in question was not necessary for the effective advocacy of the cause. This was notably true in *First Nat. Bank of Mobile v. Lartigue,* 233 Ala. 670, 173 So. 21 (1937) (exclusion of potential distributees of an estate remains a matter for trial court's discretion, since administrators are in charge of the suit, and, although the distributees "are said to be the parties in real interest," there was "no showing . . . of any special need of such persons to assist in the trial"). See also *Kentucky Union Lumber Co. v. Abney,* 17 Ky.L.Rep. 401, 31 S.W. 279 (1895) (exclusion of "chief officer of the defendant corporation in said county [where suit tried]" within discretion of trial judge, since not a "party," "nor does it appear . . . that his presence was of vital importance to a fair trial of the action"); *compare Lenoir Car Co. v. Smith,* 100 Tenn. 127, 42 S.W. 879 (1897) (officer of a corporation "whose presence during the trial was essential to the proper presentation of its case" entitled to remain in courtroom). Finally, the draftsmen of the Federal Rules were preparing rules for criminal as well as civil cases. In the former, in view of the Sixth Amendment, exclusion of a party would indeed "raise serious problems of confrontation and due process," as stated in the Advisory Committee's Note to Rule 615.[7] In contrast, if enforcement of § 8(a)(3) were to take place through a Government suit in a district court, we fail to see how any constitutional problem would be created by applying "the rule" to discriminatees, at least to the limited extent of excluding them during the testimony given by fellow discriminatees concerning a single event.

However, we need not decide whether, if somehow an analogous situation were to arise in a district court, witnesses occupying a position similar to discriminatees in § 8(a)(3) proceedings would be immune from sequestration because of the second sentence of Rule 615. Under the direction in § 10(b) that the rules of evidence applicable in the dis-

trict courts shall be applied only "so far as practicable," the conduct of unfair labor practice proceedings would not have to conform precisely to the second sentence of Rule 615—even if the Federal Rules of Evidence had been in effect when this hearing was held—so long as there is substantial reason for fashioning a different rule. The considerations so well stated by Judge Allen in *N.L.R.B. v. Burke Mach. Tool Co., supra,* 133 F.2d at 621, dictate some application of "the rule" in Labor Board hearings even when the witnesses are alleged discriminatees. Exclusion of discriminatees for a portion of the hearing, even if it were to be assumed that, because of Rule 615, persons similarly situated could not now be excluded in a similar type of action in a district court—an assumption which may or may not be valid—would be a small price for them to pay for the General Counsel's prosecuting the complaint on their behalf. Weighing the relative importance of the presence of a discriminatee at every moment of the trial to the zealous advocacy of his cause against the danger that his financial interest makes the temptation to perjury great, and considering the imbalance from failure to apply "the rule" to discriminatees while it would generally be applicable against the employer, we think that the ALJ should have authority to apply "the rule" to discriminatees and that, where several discriminatees are to be called as witnesses to the same incident, the presumption in favor of sequestration during such testimony could be rebutted, if at all, only by a particularized showing of need for the discriminatees to hear each other's evidence—a showing we find extremely hard to visualize. We hold, therefore, that the ALJ should have had authority to sequester the four employee witnesses during their respective testimony to the May 11 events, and that, under the rather typical facts here presented, failure to have exercised that discretion in favor of sequestration would have been an abuse of discretion.

---

7. Such exclusion is, of course, prohibited by F.R.Cr.P. 43.

## IV.

■ However, our holding on this point does not lead automatically to a remand—much less to the denial of enforcement sought by respondent. *Cf. N.L.R.B. v. Quality & Service Laundry, supra.* Apart from the repetitive testimony of these four witnesses, the ALJ had extremely solid ground for his credibility findings. Even as to the May 11 incident, the testimony of the four discriminatees found support in that of the two office workers called by respondent, one of whom denied that there were any signs in the car that the men had been drinking and the other of whom was asked no questions on the subject although she had observed Thompson on the afternoon at issue. In addition, although the ALJ used his findings that Harold Stark had lied about the May 11 incident to discredit some of Stark's other testimony, he could equally well have found that flaws in other testimony discredited that in regard to May 11. We refer particularly to Harold Stark's failure to make specific denials of Maksymchak's testimony of what occurred on May 12 when Maksymchak sought reinstatement, and of Bishop's testimony concerning the conversation on May 17, and to the failure to call Fred Stark, who was present in the hearing room, to answer Peters' version of the incident of May 14 particularly after Peters had asserted that Harold could not have heard them, and to repudiate Peters' version of Fred Stark's statements of May 15 and May 17. In the absence of any explanation it would be hard to think of a stronger case for drawing an adverse inference from failure to call a witness under a party's control. 2 Wigmore, Evidence §§ 285–86 (3d ed. 1940). Added to all this is the fact that six of the seven union adherents were discharged, and the seventh threatened, within a

week of their signing the cards. It would tax credulity to the breaking point to assume that this was mere coincidence bereft of any causal connection.[8]

## V.

■ The only other point requiring discussion is respondent's contention that Peters was a supervisor within § 2(11) and thus not an "employee," § 2(3), protected by § 8(a)(1) and (3). No useful purpose would be served by detailing the evidence. It suffices to say that this created a close question of fact whether Peters was "merely a superior workman or lead man who exercises the control of a skilled worker over less capable employees, or is a supervisor who shares the power of management," *N.L.R.B. v. Southern Bleachery & Print Works,* 257 F.2d 235, 239 (4 Cir. 1958), *cert. denied,* 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575 (1959). It is settled law that the Board's determination of this question receives even more than usual weight. As Judge Waterman said for us in *N.L.R.B. v. Metropolitan Life Ins. Co.,* 405 F.2d 1169, 1172 (2 Cir. 1968):

> Inasmuch as infinite variations and gradations of authority can exist . . . and any drawing of the line between the personnel of management and the rank and file workers may require some expertise in evaluating actual power distributions which exist within an enterprise, the Board's findings relative thereto are entitled to great weight.

See *accord, Amalgamated Local Union 355 v. N.L.R.B.,* 481 F.2d 996, 999–1000 (2 Cir. 1973) (Davis, *J.*); *Oil, Chemical and Atomic Workers Int. U. v. N.L.R.B.,* 144 U.S.App.D.C. 167, 445 F.2d 237, 241 (1971) (McGowan, *J.*).

Enforcement granted.

---

**8.** Respondent claims that the record fails to show that it knew of the employees' union activities at the time they were fired, and that, lacking such proof, the order cannot stand; apparently the claim is that the employer's knowledge must be directly proven. The law is clear that such direct evidence need not be introduced, and that the employer's knowledge can be inferred from the circumstances. *N.L.R.B. v. Link-Belt Co.,* 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368 (1941); *Amalgamated Clothing Workers v. N.L.R.B.,* 112 U.S.App. D.C. 252, 302 F.2d 186, 190 (1962).