**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HALE MANUFACTURING COMPANY, INC., Respondent.**

No. 77–1280.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 16, 1977.

Decided Feb. 1, 1978.

Rehearing Denied Feb. 27, 1978.

Bernard P. Jeweler, Atty., National Labor Relations Board, Washington, D. C. (argued), Michael S. Winer, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Dep-

uty Associate Gen. Counsel, National Labor Relations Board, Washington, D. C., on brief, for petitioner.

Branham Rendlen, Hannibal, Mo. (argued), Roger D. Sanders, Sherman, Tex. (argued), and Don L. Jarvis, Sherman, Tex., on brief, for respondent.

Before HEANEY, WEBSTER and HENLEY, Circuit Judges.

WEBSTER, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order against Respondent, Hale Manufacturing Co.[1] The Board held that the Company violated § 8(a)(1) of the National Labor Relations Act by discharging seven production employees because of their concerted request for a pay raise, thereby infringing upon rights guaranteed to them under the Act. Respondent challenges both the substance of the Board's decision and the procedure by which it was reached. We grant enforcement.

I.

Hale Manufacturing operates a production facility for the manufacture of horse trailers in Taylor, Missouri. During the period in issue the plant manager of this facility was Al Godsey, who was also responsible for the sale and distribution of the trailers. James McKinney was the shop foreman in the facility, and, although he was discharged with the other workers, his dismissal is not alleged to be a violation of the Act because he was a supervisory employee. At the time of the incident, the Company had eleven workers in its employ, including the seven production workers involved in this case.

On previous occasions the production workers had been able to present grievances and suggestions to Godsey and to work with him in implementing their ideas. In particular, in response to an earlier complaint about their compensation, Godsey had instituted a bonus plan to augment the workers' hourly wages. This plan set a base figure for each trailer produced and allowed the workers to share any amount by which production costs for the month fell below this figure multiplied by the number of trailers produced.

During the latter part of February 1976, a shortage of parts at the plant forced a temporary production halt. Godsey asked James McKinney to select three or four of the production employees to inventory and clean up the next day, and, on February 27, 1976, four men (including McKinney) worked from four to six hours at these tasks. Sometime during the following week, McKinney computed the anticipated bonuses for February and mentioned this figure to the other employees. When payroll checks were received on March 5, however, the workers received less than they had expected. Godsey explained that he had treated the clean-up work by the four employees as a production cost and this had reduced the bonus fund by the amount of such wages. The same day, Godsey and one of the employees, Dennis Stice, engaged in a heated discussion on this topic.

On March 8, 9, and 10, while Godsey was away from the plant on a sales trip, the workers continued their discussions and decided to approach Godsey with a request to eliminate the bonus plan and replace it with a straight hourly wage of $5 per hour. During this period, they continued their work producing trailers. When Godsey returned to the plant about 9:00 on the morning of March 11, McKinney informed him that the employees wished to meet with him. Godsey then went into the foreman's office, where the seven production employees and McKinney were assembled. After an exchange of remarks dealing with working conditions, but mostly with the salary plan the workers wanted instituted, Godsey asked, "What will it take?" McKinney responded that they desired the elimination of the bonus plan and the institution of a straight $5 per hour rate. Godsey responded, "There just isn't any way I am paying it; you are all going to have to go home."

---

1. The Board's Decision and Order is reported at 228 NLRB No. 4, 94 LRRM 1335 (1977).

There was testimony that Godsey was angrier than the workers had even seen him before and that the tone of his voice reflected the significance of his mood. The employees then proceeded to punch out on the timeclock and leave the building. As he was leaving the office, one of the employees, Joe Thomas, asked if Godsey needed 13 cents to mail Thomas' paycheck, to which Godsey responded that he could "handle that."

During the next two days, there were conversations between some of the workers and some of the Company's other employees—one involved Gregg Niese, the bookkeeper; the other, John Totsch a truckdriver and salesman—in which it became evident that the parties had differing interpretations as to what had occurred in the meeting. Godsey communicated directly with only two of the discharged persons. On March 12, Godsey spoke with Jim McKinney, who had come to the plant to return his keys. Godsey told McKinney that he felt the workers had quit; McKinney disagreed with him. In response to McKinney's inquiry about getting his job back, Godsey told him that the position of shop foreman was being eliminated. Godsey told McKinney that, if the employees wanted to come back to work, they should be there Monday morning and they could attempt to work something out. He stated, however, that there were two workers that he did not want back at all but did not identify them to McKinney.

■ On or about May 17, 1976, Leslie Heinze accompanied his cousin to the plant so that the cousin could submit an employment application. At that time, Godsey asked Heinze to come into the office so he could talk to him. In response to a question as to why the employees had quit, Heinze did not deny that they had quit but rather referred to their low pay as the reason.[2]

The test of whether or not an employee has been discharged depends upon the rea-

sonable inference that the employees could draw from the language used by the employer. *NLRB v. Hilton Mobile Homes,* 387 F.2d 7, 9 (8th Cir. 1967); *see Viele & Sons, Inc.,* 227 NLRB No. 284, 94 LRRM 1558 (1977); *AMP, Inc.,* 218 NLRB 33, 89 LRRM 1272 (1975). In *NLRB v. Trumbull Asphalt Co. of Delaware,* 327 F.2d 841, 843 (8th Cir. 1964), Judge, now Mr. Justice, Blackmun said,

> The fact of discharge of course does not depend on the use of formal words of firing. It is sufficient if the words or action of the employer "would logically lead a prudent person to believe his tenure had been terminated".

In the case before us, the Administrative Law Judge found that Godsey had fired the workers on March 11, 1976. "I agree that the words spoken by Plant Manager Godsey on March 11 could be reasonably interpreted by the employees to indicate that Godsey had fired them, and even though Godsey did not directly and specifically tell the employees that they were fired or terminated."

In reviewing that finding, the standard of our review is governed by statute. Section 10(e) of the NLRA, 29 U.S.C. § 160(e), states that "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." This standard has been interpreted in numerous decisions, including those of the Supreme Court.

> [A] court may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.* Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record

---

2. The Administrative Law Judge discounted the value of Heinze's testimony because he had "no actual knowledge of the labor law meanings of the terms 'quit,' 'walkout,' or 'strike,' and it was clear from his testimony that he was easily confused by such terms as well as by compound questions."

in its entirety furnishes, including the body of evidence opposed to the Board's view.

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *see NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962) (per curiam); *R. J. Lallier Trucking v. NLRB,* 558 F.2d 1322, 1326 (8th Cir. 1977); *NLRB v. Columbia Tribune Publishing Co.,* 495 F.2d 1384, 1389 (8th Cir. 1974); *NLRB v. Penzel Construction Co.,* 449 F.2d 148 (8th Cir. 1971) (per curiam); *NLRB v. Morrison Cafeteria Co. of Little Rock,* 311 F.2d 534 (8th Cir. 1963). The question of the credibility of witnesses is primarily one for determination by the trier of fact. *NLRB v. Midwest Hanger Co.,* 550 F.2d 1101, 1104 (8th Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 112, 54 L.Ed.2d 90 (1977); *Chemvet Laboratories, Inc. v. NLRB,* 497 F.2d 445, 449 (8th Cir. 1974); *NLRB v. Penzel Construction Co., supra,* 449 F.2d at 149.

■ This Court has noted, however, that this rule is not to be applied mechanically, and determinations made by the Board must be based upon inferences reasonably drawn from the evidence before it. In *NLRB v. Hart Beverage Co.,* 445 F.2d 415, 419–20 (8th Cir. 1971), the Court said,

> [W]e must accept the agency's findings of fact if they are supported by substantial evidence on the record considered as a whole . . . . However, we are not to abdicate our judicial function and become a mere rubber stamp for administrative action. . . . And we must keep in mind that the "substantiality of

evidence must take into account whatever in the record fairly detracts from its weight."

*Accord, NLRB v. Century Broadcasting Corp.,* 419 F.2d 771 (8th Cir. 1969); *see NLRB v. Payless Cashway Lumber Store of South St. Paul, Inc.,* 508 F.2d 24 (8th Cir. 1974); *NLRB v. Alva Allen Industries, Inc.,* 369 F.2d 310 (8th Cir. 1966).

■ Applying this standard to the facts of this case, and, after an examination of the record of the proceedings before the Administrative Law Judge, we conclude there is substantial evidence to support the finding that Al Godsey did in fact fire the seven workers on March 11, 1977. Although it may be argued to the contrary, there is substantial evidence from which it can reasonably be inferred that Al Godsey's direction to the workers was intended to be, and was interpreted by them, as a discharge.[3] The words themselves are an indication that Godsey was directing the employees to leave whether they wanted to or not.[4] Godsey testified that he had used similar language in firing his brother for drinking on the job. Several of the workers testified that Godsey was extremely agitated and that they had never seen him this angry before. Moreover, the testimony regarding the 13 cents needed to mail Joe Thomas' check is a clear indication that the termination was considered final by Godsey. Finally, Godsey commented to Jim McKinney on the following day that he did not intend to take back a couple of the workers. This statement permits the inference that, with respect to the others, he might be

---

3. Numerous discussions took place among the workers regarding the wage issue prior to the meeting with Al Godsey. There is considerable testimony in the record that the seven employees intended to engage in some collective action, either by quitting or going out on strike, if their demands were not met. The Administrative Law Judge found that the seven were fired before they had a chance to quit.

4. Respondent argues that in cases involving similar facts, *see, e. g., Eaborn Trucking Service,* 156 NLRB 1370, 61 LRRM 1268 (1966); *Tailored Trend, Inc.,* 126 NLRB No. 43, 45 LRRM 1323 (1960); *Electric Auto-Lite Co.,* 80 NLRB No. 243, 23 LRRM 1268 (1948), the

Board has found that no discharge was effected; rather it has found the employees to have quit voluntarily. It further contends that the Board has failed to explain sufficiently its failure to follow its own precedent. *See Teamsters Local Union No. 769 v. NLRB,* 174 U.S. App.D.C. 310, 532 F.2d 1385 (1976). Because this is an area in which inferences must be drawn from the totality of the circumstances, the existence of precedent is rarely helpful. Moreover, the cases cited by the Company involved words that were more clearly in the alternative than those used by Godsey in this case.

willing to relent on a decision already made. While this evidence is capable of differing interpretations, we do not find the inferences drawn by the Administrative Law Judge to be unreasonable and affirm his findings that a discharge had taken place.[5]

## II.

Respondent raises several contentions about the conduct of the Board's investigation and the hearing before the Administrative Law Judge. Only one such contention requires comment.[6] At the commencement of the hearing, the Company moved to exclude the discharged workers from the courtroom while any of the other workers were testifying. The General Counsel opposed this motion, and the Administrative Law Judge ruled that alleged discriminatees have a right to remain in the hearing room during the hearing. On appeal, the Company contends this is a case in which the witnesses should have been excluded, even though they were the alleged discriminatees, because of the possibility that they would blend or color their testimony to fit each other's.

Although this Court has enforced a Board order in which the Board said that employees who are alleged discriminatees are entitled to be present during the taking of testimony because they effectively occupy the status of complainants, *Walsh-Lumpkin Wholesale Drug Co.,* 129 NLRB 295, 46 LRRM 1535 (1960), *enforced,* 291 F.2d 751 (8th Cir. 1961) (per curiam), we think the opinion of the Second Circuit in *NLRB v. Stark,* 525 F.2d 422 (2d Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed.2d 734 (1976), correctly sets forth the considerations before the court when the issue of sequestering witnesses who are also the alleged discriminatees is raised in the proceeding. The Second Circuit noted that NLRA § 10(b), 29 U.S.C. § 160(b), provides that insofar as it is practicable, proceedings shall be conducted in accordance with the rules of evidence applicable in the district courts, and that it is the role of the judiciary to determine how closely Board proceedings must conform to the procedures used in the district courts. It stated that the sequestration rule contained in Fed.R. Evid. 615[7] "would rank high in a list of evidentiary doctrines which courts . . should enforce upon the NLRB." 525 F.2d at 427. The Court rejected the notion that discriminatees are entitled to be present

---

**5.** Our enforcement of the Board's order includes that portion of the Administrative Law Judge's decision ordering reinstatement and backpay with interest "from the date of the [discharge] to the date of Respondent's offer of reinstatement." This amount must be worked out by the parties, or if necessary, settled in a supplementary proceeding before the Board. *See, e. g., NLRB v. Midwest Hanger Co.,* 550 F.2d 1101, 1102–03 (8th Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 112, 54 L.Ed.2d 90 (1977). We intimate no view at this time as to the computation of the proper amount or period of time for which the Company is liable.

We do, however, reject the Company's contention that the discharge was one for cause. Hale Manufacturing argues that the employees were engaging in, or could be believed to be engaging in, a protracted slowdown, and this was the motivation behind their discharge. This contention was considered by the Administrative Law Judge, who nonetheless found that the discharge violated § 8(a)(1). We concur in that finding.

**6.** The Company also contends that (1) the government suppressed relevant evidence, unfavorable to its case by failing to produce an affidavit of one of the witnesses until its existence was revealed at trial; (2) the Administrative Law Judge should have allowed the Company to call and examine the General Counsel's agents who investigated the complaint because their testimony was relevant and was not privileged; and (3) it was error not to reopen the record to consider a decision of the state unemployment agency that was favorable to the Company on this issue. We have examined these claims and conclude that no error occurred and that the contention of the Company, that it was not accorded even the appearance of fair treatment, is equally without merit.

**7.** Fed.R.Evid. 615 reads as follows:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

because they are "parties," *id.* at 429, and said that the rule of sequestration must be applied in some fashion even when the witnesses are the alleged discriminatees, *id.* at 430.

> [W]e think that the ALJ should have authority to apply "the rule" to discriminatees and that, where several discriminatees are to be called as witnesses to the same incident, the presumption in favor of sequestration during such testimony could be rebutted, if at all, only by a particularized showing of need for the discriminatees to hear each other's evidence—a showing we find extremely hard to visualize.

*Id.* The failure to sequester the witnesses was found to be an abuse of discretion but the Court was unwilling to say that a remand or failure to enforce was automatic under the circumstances of the case. Rather, the Court found substantial evidence to support the Administrative Law Judge's decision even without consideration of the testimony of the discriminatees who should have been sequestered.

In *L. S. Ayres & Co. v. NLRB*, 551 F.2d 586, 588 (4th Cir. 1977) (per curiam), the Fourth Circuit agreed with the holding in *Stark* that sequestration is desirable, but said that generally this issue is a matter of Board discretion. The Court went on to hold that even if the discretion were abused in the case before it, no prejudice to the other party had been shown. The Court expressly did not decide the question to what extent Fed.R.Evid. 615 is generally applicable to Board proceedings.

We agree with the Fourth Circuit that whether or not witnesses should be sequestered is a matter within the discretion of the Administrative Law Judge, but conclude that generally this discretion should be exercised in favor of sequestration unless the General Counsel or the alleged discriminatees can show on the particular facts of the case that it is necessary for them to remain in the hearing room to hear other testimony. On the facts of this case, however, the error, even if there was one, was not prejudicial to Hale Manufacturing.

The testimony of Jim McKinney, who was not one of the alleged discriminatees and who was the first witness to testify, and of Al Godsey, the plant manager, contain sufficient evidence to affirm the findings of the Administrative Law Judge. On these facts we will not order a remand or deny enforcement of the Board's order.