922 F.2d 139
 54 Fair Empl.Prac.Cas. 1287,
55 Empl. Prac. Dec. P 40,461
Maureen E. BARBANO, Plaintiff-Appellee-Cross-Appellant,
v.
MADISON COUNTY; Madison County Board of Supervisors;
Madison County Veterans Affairs Committee; Donald
Greene, Defendants,
Madison County; Madison County Board of Supervisors;
Madison County Veterans Affairs Committee,
Defendants-Appellants-Cross-Appellees.
 Nos. 392, 546, Dockets 90-7422, 90-7476.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 1, 1990.
Decided Dec. 28, 1990.
 
 David E. Peebles, Syracuse, N.Y. (Hancock & Estabrook, of counsel), for defendants-appellants-cross-appellees.
 Robert David Goodstein, New Rochelle, N.Y. (Goodstein & West, of counsel), for plaintiff-appellee-cross-appellant.
 Before FEINBERG, VAN GRAAFEILAND and KEARSE, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Defendants appeal from a judgment of the United States District Court for the Northern District of New York, Thomas J. McAvoy, J., finding them liable for gender discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e et seq., and awarding plaintiff Maureen E. Barbano back pay, prejudgment interest and attorney's fees. After a bench trial, the district court found that defendants Madison County, the Madison County Board of Supervisors (the Board) and the Madison County Veterans Affairs Committee (the Committee) discriminated against Barbano on the basis of her sex in rejecting her application for the job of Director of the Madison County Veterans Service Agency. This appeal raises a number of questions, including whether evidence of discrimination during an interview conducted by the Committee supports a finding that the Board discriminated by adopting the Committee's recommendation in making the hiring decision. Barbano cross-appeals on grounds that the district court erred by not awarding "front pay" (prospective wages) and granting a mandatory injunction that she be appointed Director upon the next vacancy. For reasons given below, we affirm the judgment of the district court.
 
 Background
 
 2
 The Madison County Veterans Service Agency offers counseling, information and other services to veterans and their dependents. In February 1980, the position of Director of the Agency became vacant. The Director holds an administrative position and is responsible for supervising veterans' programs for the county. The job description for that position required:
 
 
 3
 Thorough knowledge of federal, state and local laws, rules and regulations pertaining to veterans' benefits and services; thorough knowledge of forms, methods and procedures and records necessary for the processing of veterans' benefits claims; demonstrated ability in public relations; ability to express ideas clearly and concisely orally and in writing; good judgment; willingness to accept responsibility; resourcefulness; interest; tact; good physical condition.
 
 
 4
 The Board decided to hold interviews before appointing a new Director. The interviews were to be conducted by the Committee, which would then submit its recommendation to the Board. Barbano applied for the position and was interviewed in February 1980 by Douglas S. Newbold, Chairman of the Committee, and Committee members Donald Greene, Harrison Holdridge, James E. Powell and James Rafte. Don R. Callahan, who took part in a number of the interviews in his capacity as Chairman of the Board but not as a voting member of the Committee, also participated in the interview.
 
 
 5
 Before entering the interview, Barbano heard someone say, "Here are copies of the next resume," followed by the comment, "Oh, another woman." The interview began, and after Barbano stated why she thought she was qualified for the job, Greene said that he would not consider "some woman" for the position. Greene then asked Barbano her plans on having a family and whether her husband would object to her transporting male veterans. Barbano said the questions were irrelevant and discriminatory. No one responded, except for Greene, who insisted on answers to his questions. Barbano again protested that the questions were discriminatory. Greene replied that the questions were relevant because he did not want to hire a woman who would get pregnant and quit. Newbold also said the questions were relevant. None of the interviewers rebuked Greene, objected to the questions or told Barbano that she need not answer them. Barbano stated that if she decided to have a family she would take no more time off than medically necessary. Greene once again asked whether Barbano's husband would object to her "running around the country with men" and said he would not want his wife to do it. Barbano said she was not his wife. The interview concluded after Barbano asked some questions about insurance.
 
 
 6
 The Committee interviewed several other candidates, and found all of them (including Barbano) to be qualified for the position. Following the interview process, the interviewers ranked the applicants and unanimously agreed to recommend Allan Wagner to the Board. In March 1980, the Committee submitted the recommendation to the Board in the form of a resolution, and the Board, which consisted of 19 members, unanimously approved the resolution at a public meeting. Shortly thereafter, Wagner began working as Director and continues to occupy the position.
 
 
 7
 Barbano commenced this action in 1982, asserting claims under Title VII and 42 U.S.C. Sec. 1983. After a three-day bench trial, Judge McAvoy, in an opinion dated September 13, 1988, dismissed the section 1983 claim because it was based only on Title VII violations. The court then found that Barbano had established a prima facie case of discrimination under Title VII, thus bringing into issue appellants' purported reasons for not hiring her. Appellants provided four reasons why they chose Wagner over Barbano, which the district court rejected as either unsupported by the record or a pretext for discrimination in light of Barbano's interview. The district court then found that due to Barbano's education and experience in social services, appellants had failed to prove that, absent the discrimination, they still would not have hired Barbano. Accordingly, the court awarded Barbano back pay, prejudgment interest and attorney's fees. Subsequently, the court denied Barbano's request for front pay and a mandatory injunction ordering her appointment as Director upon the next vacancy. This appeal and cross-appeal followed.
 
 Discussion
 
 8
 Appellants argue that the district court erred in finding that Greene's statements during the interview showed that the Board discriminated in making the hiring decision, and that there was no direct evidence of discrimination by the Board, making it improper to require that appellants prove that they would not have hired Barbano absent the discrimination. Barbano in turn challenges the adequacy of the relief awarded to her by the district court.
 
 A. Discrimination
 
 9
 At the outset, we note that Judge McAvoy's opinion predated Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1990), in which the Supreme Court made clear that a "pretext" case should be analyzed differently from a "mixed motives" case. Id. 109 S.Ct. at 1788-89. Judge McAvoy, not having the benefit of the Court's opinion in Price Waterhouse, did not clearly distinguish between the two types of cases in analyzing the alleged discrimination. For purposes of this appeal, we do not think it is crucial how the district court categorized the case. Rather, we need only concern ourselves with whether the district court's findings of fact are supported by the record and whether the district court applied the proper legal standards in light of its factual findings.
 
 
 10
 Whether the case is one of pretext or mixed motives, the plaintiff bears the burden of persuasion on the issue of whether gender played a part in the employment decision. Id. at 1788. Appellants contend that Barbano did not sustain her burden of proving discrimination because the only evidence of discrimination involved Greene's statements during the interview, and Greene was an elected official over whom the other members of the Board exercised no control. Thus, appellants maintain, since the hiring decision was made by the 19-member board, evidence of discrimination by one member does not establish that the Board discriminated in making the hiring decision.
 
 
 11
 We agree that discrimination by one individual does not necessarily imply that a collective decision-making body of which the individual is a member also discriminated. However, the record before us supports the district court's finding that the Board discriminated in making the hiring decision.
 
 
 12
 First, there is little doubt that Greene's statements during the interview were discriminatory. He said he would not consider "some woman" for the position. His questioning Barbano about whether she would get pregnant and quit was also discriminatory, since it was unrelated to a bona fide occupational qualification. King v. Trans World Airlines, 738 F.2d 255, 258 n. 2 (8th Cir.1984). Similarly, Greene's questions about whether Barbano's husband would mind if she had to "run around the country with men," and that he would not want his wife to do it, were discriminatory, since once again the questions were unrelated to bona fide occupational qualifications. See Price Waterhouse, 109 S.Ct. at 1786; 29 C.F.R. Sec. 1604.7.
 
 
 13
 Moreover, the import of Greene's discriminatory questions was substantial, since apart from one question about her qualifications, none of the interviewers asked Barbano about other areas that allegedly formed the basis for selecting a candidate. Thus, Greene's questioning constituted virtually the entire interview, and so the district court properly found that the interview itself was discriminatory.
 
 
 14
 Next, given the discriminatory tenor of the interview, and the acquiescence of the other Committee members to Greene's line of questioning, it follows that the judge could find that those present at the interview, and not merely Greene, discriminated against Barbano. Judge McAvoy pointed out that the Chairman of the Committee, Newbold, thought Greene's discriminatory questions were relevant. Significantly, Barbano protested that Greene's questions were discriminatory, but no one agreed with her or told her that she need not answer. Indeed, no one even attempted to steer the interview in another direction. This knowing and informed toleration of discriminatory statements by those participating in the interview constitutes evidence of discrimination by all those present. Cf. Price Waterhouse, 109 S.Ct. at 1794 & n. 16; Blake v. J.C. Penney Co., 894 F.2d 274, 278 (8th Cir.1990). That each member was independently elected to the Board does not mean that the Committee itself was unable to control the course of the interview. The Committee had a choice of how to conduct the interview, and the court could find that the Committee exercised that choice in a plainly discriminatory fashion.
 
 
 15
 This discrimination directly affected the hiring decision. At the end of the interviewing process, the interviewers evaluated the candidates, and on that basis submitted a recommendation as to which candidate to hire for the position. "Evaluation does not occur in a vacuum. By definition, when evaluating a candidate to fill a vacant position, one compares that candidate against other eligible candidates." Berl v. County of Westchester, 849 F.2d 712, 715 (2d Cir.1988). Appellants stipulated that Barbano was qualified for the position. Again, because Judge McAvoy could find that the evaluation of Barbano was biased by gender discrimination, the judge could also find that the Committee's recommendation to hire Wagner, which was the result of a weighing of the relative merits of Barbano, Wagner and the other eligible candidates, was necessarily tainted by discrimination.
 
 
 16
 The Board in turn unanimously accepted the Committee's recommendation to hire Wagner, and so the Board's hiring decision was made in reliance upon a discriminatory recommendation. The Supreme Court in Price Waterhouse found that a collective decision-making body can discriminate by relying upon discriminatory recommendations, and we are persuaded that the reasoning in that case applies here as well.
 
 
 17
 In Price Waterhouse, Ann Hopkins, a candidate for partnership at the accounting firm of Price Waterhouse, alleged that she was refused admission as a partner because of sex discrimination. Hopkins's evidence of discrimination consisted largely of evaluations made by various partners. Price Waterhouse argued that such evidence did not prove that its internal Policy Board, which was the effective decision-maker as to partnership in that case, had discriminated. The Court rejected that argument and found the evidence did establish discrimination:Hopkins showed that the partnership solicited evaluations from all of the firm's partners; that it generally relied very heavily on such evaluations in making its decision; that some of the partners' comments were the product of [discrimination]; and that the firm in no way disclaimed reliance on those particular comments, either in Hopkins' case or in the past. Certainly, a plausible--and, one might say, inevitable--conclusion to draw from this set of circumstances is that the Policy Board in making its decision did in fact take into account all of the partners' comments, including the comments that were motivated by [discrimination].
 
 
 18
 109 S.Ct. at 1794.
 
 
 19
 In a very significant sense, Barbano presents an even stronger case of discrimination because the only recommendation the Board relied upon here was discriminatory, whereas in Price Waterhouse, not all of the evaluations used in the decision-making process were discriminatory. On the other hand, it is true that the discriminatory content of some of the evaluations in Price Waterhouse was apparent from reading them, whereas here, the recommendation was embodied in a resolution to the Board and a reading of the resolution would not reveal that it was tainted by discrimination. Nonetheless, the facts in this case show that the Board was put on notice before making the appointment that the Committee's recommendation was biased by discrimination.
 
 
 20
 Barbano was a member of the public in attendance at the Board meeting in March 1980 when the Board voted to appoint Wagner. Before the Board adopted the resolution appointing Wagner, Barbano objected and asked the Board if male applicants were asked the questions she was asked during the interview. At this point, the entire Board membership was alerted to the possibility that the Committee had discriminated against Barbano during her interview. The Committee members did not answer the question, except for Newbold, who evaded the issue by stating that he did not ask such questions. The Board's ability to claim ignorance at this point was even further undermined by the fact that the Chairman of the Board, Callahan, was present at many of the interviews, including Barbano's, in his role as Chairman of the Board. Callahan did not refute Barbano's allegations, implying that they were worthy of credence, and none of the Board members even questioned Callahan on the matter.
 
 
 21
 It is clear that those present understood Barbano was alleging that she had been subjected to discrimination during her interview. John Patane, a member of the Board who had not interviewed Barbano, asked Barbano whether she was implying that Madison County was not an equal opportunity employer. Barbano said yes. Patane said the County already had their "token woman." Callahan apologized to Barbano for "any improper remarks that may have been made," but an apology for discrimination does not constitute an attempt to eliminate the discrimination from the hiring decision. Even though the Board was aware of possible improprieties, it made no investigation whatsoever into the allegations and did not disclaim any reliance upon the discrimination. In short, the circumstances show the Board was willing to rely on the Committee's recommendation even if Barbano had been discriminated against during her interview. On these facts, it was not clearly erroneous for the district court to conclude that Barbano sustained her burden of proving discrimination by the Board.
 
 B. The Employer's Burden
 
 22
 Having found that Barbano carried her burden of proving discrimination, the district court then placed the burden on appellants to prove by a preponderance of the evidence that, absent the discrimination, they would not have hired Barbano for the position. Appellants argue that this burden is only placed on an employer if the plaintiff proves discrimination by direct evidence, and since Barbano's evidence of discrimination was merely circumstantial, the district court erred by placing the burden of proof on them. Appellants, however, misapprehend the nature of Barbano's proof and thus the governing legal standard.
 
 
 23
 The burden is properly placed on the defendant "[o]nce the plaintiff establishes by direct evidence that an illegitimate factor played a motivating or substantial role in an employment decision." Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1568 (2d Cir.1989). Thus, the key inquiry on this aspect of the case is whether the evidence is direct, that is, whether it shows that the impermissible criterion played some part in the decision-making process. See Price Waterhouse, 109 S.Ct. at 1791; Grant, 880 F.2d at 1569. If plaintiff provides such evidence, the factfinder must then determine whether the evidence shows that the impermissible criterion played a motivating or substantial part in the hiring decision. Grant, 880 F.2d at 1569.
 
 
 24
 As we found above, the evidence shows that Barbano's gender was clearly a factor in the hiring decision. That the discrimination played a substantial role in that decision is shown by the importance of the recommendation to the Board. As Rafte testified, the Board utilizes a committee system, and so the Board "usually accept[s]" a committee's recommendation, as it did here when it unanimously voted to appoint Wagner. Had the Board distanced itself from Barbano's allegations of discrimination and attempted to ensure that it was not relying upon illegitimate criteria in adopting the Committee's recommendation, the evidence that discrimination played a substantial role in the Board's decision would be significantly weakened. The Board showed no inclination to take such actions, however, and in adopting the discriminatory recommendation allowed illegitimate criteria to play a substantial role in the hiring decision.
 
 
 25
 The district court thus properly required appellants to show that the Board would not have hired Barbano in the absence of discrimination. "The employer has not yet been shown to be a violator, but neither is it entitled to the ... presumption of good faith concerning its employment decisions. [A]t this point the employer may be required to convince the factfinder that, despite the smoke, there is no fire." Price Waterhouse, 109 S.Ct. at 1798-99 (O'Connor, J., concurring).
 
 
 26
 Judge McAvoy noted in his opinion that appellants claimed they chose Wagner over Barbano because he was better qualified in the following areas: (1) interest in veterans' affairs; (2) experience in the military; (3) tactfulness; and (4) experience supervising an office. The judge found that the evidence before him supported only appellants' first and second reasons for refusing to hire Barbano, but acknowledged that the Committee members "were enamored with Wagner's military record and involvement with veterans' organizations." However, neither of these is listed as a job requirement in the job description, although the district court found that membership in a veterans' organization may indicate an interest in veterans' affairs. Nonetheless, the district court found that given Barbano's "education and experience in social services," appellants failed to carry their burden of proving by a preponderance of the evidence that, absent discrimination, they would not have hired Barbano.
 
 
 27
 The district court properly held appellants to a preponderance of the evidence standard. Price Waterhouse, 109 S.Ct. at 1795. Appellants contend that the district court "impermissibly substituted its own opinion on the matter" in rejecting their reasons for not hiring Barbano. This is a curious argument for appellants to offer, since Judge McAvoy as the trier of fact was required to have an opinion--more precisely, to make a finding--on whether the asserted reasons for the discharge sustained appellant's burden of proving that they would not have hired Barbano absent the discrimination. In any event, our review of the record indicates that the district judge did not commit error.
 
 
 28
 At the time of the hiring decision in 1980, Barbano had been a Social Welfare Examiner for Madison County for the three previous years. In this position, she determined the eligibility of individuals for public assistance, medicaid or food stamps, and would then issue or deny the individual's application based on all federal, state and local regulations pertaining to the program from which the individual was seeking assistance. Barbano was thus familiar with the operation of public assistance programs, knew how to fill out forms relating to benefits and had become familiar with a number of welfare agencies that could be of use to veterans. Barbano was also working towards an Associate Degree in Human Services at the time. Rafte testified that Barbano's resume was "very impressive." Moreover, Barbano, unlike Wagner, was a resident of Madison County, and according to Rafte, a candidate's residency in the county was considered to be an advantage. Finally, Barbano had also enlisted in the United States Marine Corps in 1976, but during recruit training had been given a vaccine that affected her vision. She had received an honorable discharge shortly thereafter.
 
 
 29
 Wagner had nine years experience as an Air Force Personnel Supervisor, maintaining personnel records, had received a high school equivalency diploma and took several extension classes in management. He had been honorably discharged from the Air Force in 1965 with the rank of Staff Sergeant. Wagner was a member of the American Legion, and his application for the position included recommendations from two American Legion members. However, for the six years prior to his appointment as Director, Wagner's sole paid employment was as a school bus driver and part-time bartender at the American Legion. Wagner admitted that before he was hired he had no knowledge of federal, state and local laws, rules and regulations pertaining to veterans' benefits and services, or knowledge of the forms, methods and procedures used to process veteran benefits claims. Wagner also had not maintained liaison with welfare agencies and was unfamiliar with the various welfare agencies that existed in the county.
 
 
 30
 To be sure, both candidates were qualified for the Director's position, and it is not our job--nor was it the district court's--to decide which one was preferable. However, there is nothing to indicate that Judge McAvoy misconceived his function in this phase of the case, which was to decide whether appellants failed to prove by a preponderance of the evidence that they would not have hired Barbano even if they had not discriminated against her. The judge found that defendants had not met that burden. We must decide whether that finding was clearly erroneous, and we cannot say that it was.
 
 C. The Adequacy of Relief
 
 31
 Barbano cross-appeals from the district court's denial of her request for front pay and a mandatory injunction ordering her appointment as Director upon the next vacancy. District courts should fashion remedies ensuring that victims of gender discrimination are made whole. Cf. Whittlesey v. Union Carbide Corp., 742 F.2d 724, 727-28 (2d Cir.1984). A district court is given the sound discretion to determine these remedies, and so our inquiry on the cross-appeal is limited to whether the district court abused its discretion. See Carrero v. New York City Housing Authority, 890 F.2d 569, 579 (2d Cir.1989).
 
 
 32
 Judge McAvoy awarded Barbano back pay, which covered approximately an eight and one-half year period, prejudgment interest and attorney's fees, and Barbano ultimately received over $55,000 pursuant to the judgment. On this record, in light of the relief Barbano received, we find the district court did not abuse its discretion in denying Barbano's request for front pay and a mandatory injunction.
 
 
 33
 Barbano also contends that the district court abused its discretion because it did not state the reasons for denying a mandatory injunction and front pay. We would be troubled by this if the circumstances indicated that the district court erroneously felt that it was without discretion to award such relief. However, when Barbano moved to vacate the order denying front pay and a mandatory injunction, the district court denied the motion and stated that whether it abused its discretion in failing to award this relief was properly a subject of appeal. The district court was thus aware that it had the discretion to award the relief requested. Although it would have been better had the district court expressly stated its reasons for denying the relief, on this record the denial was tantamount to stating that the relief actually awarded was sufficient to make Barbano whole. Under the circumstances, we do not believe that the failure to give reasons was an abuse of discretion requiring reversal or remand.
 
 
 34
 We affirm the judgment of the district court.
 
 
 35
 VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:
 
 
 36
 In 1980, the following people were members of the Board of Supervisors of Madison County:
 
 Don R. Callahan
 Leland T. Whipple
 Robert B. Palmiter
 Harrison R. Holdridge
 Donald R. Huller
 Calvin Brewster
 E. Bart Hanifin
 Jason D. Rogers
 Francis T. Costello
 James E. Powell
 Richard Lamb
 Donald Greene
 Bettina Simberg
 Richard Wood
 Douglas S. Newbold
 John S. Patane
 William Magee
 Dr. John McCann
 James Rafte
 
 37
 The district court held that the Board violated federal law in that the members discriminated against plaintiff because of her sex. My colleagues agree. Because I believe that the members of the Board have been grievously wronged by these holdings, I disagree.
 
 
 38
 Madison County, located in upstate New York, is predominately rural and has a population of only 65,000. However, not a single member of Madison County's Board of Supervisors was elected by the vote of these 65,000 County residents. The County contains a number of small towns, each of which, like the County itself, is an involuntary subdivision of the State. See Curtis v. Eide, 19 A.D.2d 507, 508, 244 N.Y.S.2d 330 (1963). Each town is required to elect a town supervisor. N.Y. Town Law Sec. 20.[1] Each automatically becomes a member of the County Board of Supervisors. Id. at Sec. 41(7); N.Y. County Law Sec. 150. As such a member, he or she has "powers and duties co-ordinate with the powers and duties of the supervisors of other towns in the county." N.Y. Town Law Sec. 41(7).
 
 
 39
 The New York courts have interpreted the foregoing statutory provisions on a number of occasions; see, e.g.:
 
 
 40
 Lane v. Johnson, 283 N.Y. 244, 260 [28 N.E.2d 705] (1940).
 
 
 41
 "It is true, as we have said, that a Supervisor becomes a member of the Board of Supervisors of the county, but, as this court long ago pointed out, 'members of the board of supervisors are never elected as such, but hold that office and perform its duties under a general law, and by force of their election as supervisors of separate towns or cities.' "
 
 
 42
 Matter of Noble, 34 A.D. 55, 58 [54 N.Y.S. 42] (1898).
 
 
 43
 "Although the board of supervisors is a county organization, its members are not elected by the body of electors of the county, but are chosen by the electors of their several towns respectively, and individually they are classed as town officers.... Each town has its duly elected supervisor, who represents it as a member of the board of supervisors of the county in which the town is situated."
 
 
 44
 As above pointed out, each town supervisor's powers as a member of the County Board of Supervisors are "co-ordinate", i.e., equal in rank, quality, authority and significance, with those of other town supervisors on the Board. N.Y. Town Law Sec. 41(7). In other words, neither the County of Madison nor its Board of Supervisors can discipline or discharge a supervisor whose pronouncements do not conform to the policies of the County. The sole remedy for misconduct or malfeasance by a supervisor is removal by the Appellate Division of the State Supreme Court pursuant to section 36 of the N.Y. Public Officers Law. "No penalty other or less severe than removal is provided." Matter of Luce v. Beiter, 239 A.D. 23, 28, 265 N.Y.S. 61 (1933) (Taylor, J., dissenting). The importance of this fact will be demonstrated in the discussion that follows. Of necessity, this discussion is in some respects more comprehensive than is that of the majority opinion.
 
 
 45
 In 1978, the position of Director of Madison County Office of Veterans Affairs became vacant with the retirement of the Director then in office. Five or six candidates for appointment to the vacant office, including Joseph Hammond, James Alley and Alan Wagner, were interviewed. The choice narrowed down to Hammond and Wagner, who were said to be "neck and neck" in the opinion of the interviewing committee. Hammond was selected, primarily because he came from the same locality as did the chairman of the interviewing committee.
 
 
 46
 In February 1980, when the position of Director again became vacant, the Veterans Affairs Committee of the Board of Supervisors concluded that, because the 1978 public interviews had produced a well-qualified candidate in the person of Alan Wagner and only a relatively short period had elapsed since those interviews had been conducted, there was no need to go through the same procedure again. The Committee therefore recommended to the Board of Supervisors that it hire Wagner. However, because plaintiff, "hollering Affirmative Action and Equal Opportunity Employment" (her own words), raised a fuss about the failure to conduct new interviews, the Board decided that interviews should be conducted again. After interviewing six men and two women, the Veterans Affairs Committee recommended Wagner for the second time, and this time the Board of Supervisors voted without dissent to hire him. In fairness to Wagner and the members of the Board of Supervisors, Wagner's qualifications deserved greater consideration than was given them by the district judge, who merely observed, almost it appears by way of criticism, that the "Committee members were enamored with Wagner's military record and involvement in veterans' organizations." In view of the nature of the job position to be filled, "Director of Veterans Affairs", it would be strange indeed if the Board of Supervisors did not look kindly upon Wagner's record as a soldier and a veteran.
 
 
 47
 Because this opinion would be prolonged unduly by the incorporation in its entirety of Wagner's excellent service record, excerpts therefrom must suffice. Wagner served in the U.S. Air Force from 1954 to 1965. During that time, he took several extension courses to qualify him for service as a personnel specialist or manager, and he became active in that branch of the service. This led to his designation in 1961 as NCOIC of the 26th Air Division Reserve Affairs. His duties as such were summarized in his service report as follows:
 
 
 48
 CURRENT DUTIES: Guides subordinate units on all matters concerning administration of reserve affairs. Responsible for the submission and audit of reports prepared by subordinate units pertaining to reserve affairs. Conducts command screenings to determine special training requirements. Reviews for accuracy, validity, and consolidates reports such as Worldwide Housing, Transient Billeting Facilities, Information on Overseas Areas for AF Personnel and Their Families, Worthless Checks, and Human Reliability Report. Posts manpower authorization changes to UMD's.
 
 
 49
 The following two excerpts, the first from a report dated March 31, 1962 and the second from a report dated October 5, 1964, demonstrate the esteem in which Wagner was held by his superiors:
 
 
 50
 SSgt Wagner assumed the duties of NCOIC of 26th Air Division Reserve Affairs nine months ago without benefit of previous experience. In many ways this duty is unique within the Personnel area; and in Sgt Wagner's case, there was no experienced supervisor to provide him with guidance and training. Under these conditions it is of particular significance that he has so quickly grasped a comprehensive knowledge of the Reserve Affairs program. Sgt Wagner is very conscientious in his attitude, and mature in judgment. In those areas of his job in which flexibility of action exist, he displays a positive awareness and concern for the welfare of the Air Force rather than following the path of least resistance or favoring individual reservists based on personalities or friendships.
 
 
 51
 Strengths: When requirements reach Sgt Wagner, action is taken immediately. Difficult or distasteful tasks are never put aside to "worry about tomorrow". This degree of eagerness to keep ahead of the job is a valuable asset in any organization and inspires the respect and support of his superiors.
 
 
 52
 * * * * * *
 
 
 53
 SSgt Wagner is a very mature and conscientious NCO. He is tactful and diplomatic in the manner in which he accomplishes his assigned duties. This is considered important in view of the fact that he must continually deal with officers at higher headquarters, senior staff officers within this headquarters and subordinate echelons as a matter of daily routine. These differences in rank have not materially affected his ability to accomplish what he has set out to do. His knowledge of Reserve Affairs and training regulations and procedures have been invaluable to the Training Plans and Policies Division. His efforts have contributed substantially to resolving the complex problems associated with the screening and submission of command special training needs to higher headquarters. Due to his continuing efforts, the active duty training of reserve personnel, known as obligors, who have been arbitrarily assigned to this headquarters, has resulted in those persons to complete [sic] their military obligation. He presents a fine military appearance at all times in addition to being very courteous and personable. STRENGTHS: His most obvious strength is manifest by his loyalty coupled with my confidence in his ability to apply a common sense approach to the solving of Reserve Affairs and Personnel Training problems.
 
 
 54
 It is little wonder that Wagner consistently was ranked as "An exceptional airman of great value to the service." Wagner's election for two terms as Commander of Munnsville Post 54 of the American Legion, his additional election as Madison County Commander, and the enthusiastic support of his job candidacy by his fellow veterans speak for themselves insofar as his leadership abilities and his interest in veterans affairs are concerned.
 
 
 55
 In contrast to Wagner's experience and activities as a soldier and veteran, the record discloses that plaintiff's previous employment experience consisted of three years as a waitress at a McDonald's hamburger restaurant and three years as a clerk in the Food Stamps section of Madison County's social service department.
 
 
 56
 In the light of the foregoing, the district court's finding that "[t]he record does not support defendants' claim that Alan Wagner had more experience as a supervisor" was clearly erroneous. Plaintiff had no experience whatever as a supervisor. Wagner, a noncommissioned army officer, had ample experience. His service record, which is in evidence, contains a section entitled "How Well Does He Supervise?", and Wagner received the second highest rating possible under this section. The rating states "Succeeds under unusual or difficult circumstances. Secures high production." The above-quoted comment concerning Wagner's "CURRENT DUTIES" states that he guided subordinate units on all matters concerning administration of reserve affairs. Moreover, following his army duty, Wagner worked for nine years at Oneida Ltd., where he was foreman in the drop room and supervised approximately fifty people. In short, the district court's finding concerning relative supervisory experience was inexplicably and clearly erroneous.
 
 
 57
 Another clearly erroneous crucial finding by the district court was that the evidence "does [not] support defendants' assertion that plaintiff was lacking in tactfulness." Reams have been written about how a job applicant should conduct himself or herself during a job interview. H. Anthony Medley, in his book Sweaty Palms: The Neglected Art of Being Interviewed (1984), states that "You should be pleasant and avoid controversy." Id. at 37. Thomas L. Moffatt, in his equally informative book Land That Job (1982), writes, "Rudeness, inattentiveness, and challenging the capability of the interviewer are, of course, out of the question." Id. at 86. He continues, "[B]e sure your motions, your tone of voice, and your actual words communicate a friendly, respectful, honest, self-confident, and cooperative mental attitude." Id. at 87. One need not have read these books to realize the desirability of following these admonitions; they are statements of plain common sense. However, from start to finish, plaintiff proceeded as if these common sense admonitions did not exist.
 
 
 58
 At the very outset, she insulted Don Callahan, Chairman of the Board of Supervisors, by sending her employment application to him by Registered Mail, Return Receipt Requested. She admittedly followed this most unusual procedure to prevent Callahan from lying and saying that he had not received the application. Perhaps the district judge would not have been offended had he been in Callahan's position. However, I suggest that most persons whose integrity was called into question in this manner would take it as a slap in the face. Plaintiff was not preparing for a job interview; she was preparing for a fight.
 
 
 59
 Indeed, a review of plaintiff's deposition and her answers to interrogatories shows that she considered James Alley rather than herself to be the best choice for the job. Moreover, plaintiff's attorney, certainly with her knowledge and consent, sued the County on Alley's behalf, alleging that the job should have gone to him. When counsel for the County attempted to question plaintiff about these allegations and admissions, the district court refused to permit it, stating that the testimony was irrelevant and that plaintiff was not qualified to state whether Alley was more qualified than she for the job. This, I suggest, was clear error. Plaintiff's contention that she was entitled to the appointment stands in stark contrast to her statements that the appointment should have gone to Alley.
 
 
 60
 The committee members who testified stated that plaintiff came to the interview with a chip on her shoulder and that she was not tactful. The district court said that these assertions were frivolous. I have read the entire record very carefully, and I strongly disagree. After plaintiff made her presentation and the individual members of the committee were permitted to ask questions, Donald Greene, town supervisor of Stockbridge, asked the first one. Mr. Greene inquired how somebody who was not a veteran would qualify for the position of Director of Veterans Affairs. Plaintiff's response to this question was:
 
 
 61
 I'm sorry, sir, it's obvious to me that you haven't even looked at my resume, because I am a veteran.
 
 
 62
 Had Mr. Greene wished to engage in the controversy that plaintiff obviously desired, he could have responded that, under New York law, plaintiff was not a veteran. Article 17 of New York's Executive Law provides that to qualify as a veteran one must have been in the active military service during a war in which the United States was engaged. See N.Y.Exec.Law Secs. 350(3) and 364(1). See also N.Y.Soc.Serv.Law Sec. 168(1). New York has a long-standing policy of favoring veterans as thus defined. August v. Bronstein, 369 F.Supp. 190, 193 (S.D.N.Y.) (three judge court), aff'd mem., 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974). Plaintiff served for forty-four days in 1976, a period during which the United States was not at war. Assuming for the sake of argument that plaintiff's forty-four days of service qualified her in common parlance as a veteran, plaintiff's response to Mr. Greene's question not only lacked tact, it was boorish and rude. It certainly would not serve as a sterling example of how to win friends and influence people.
 
 
 63
 Mr. Greene then asked plaintiff whether her husband would object to her performing the duties of the job, and stated that he would not want his wife running around the countryside with a bunch of men. Plaintiff states that she told Mr. Greene "in no uncertain terms" that she was not his wife. Mr. Greene, a retired farmer sixty-two years of age, was old enough to be plaintiff's father, indeed old enough to be her grandfather. I believe that Mr. Greene, who died the following year, was entitled to something other than the churlish--"in no uncertain terms"--comment he received from plaintiff. Apparently, respect for one's elders was a policy that plaintiff abjured.
 
 
 64
 I am not at all sure that Mr. Greene's question concerning the reaction of plaintiff's husband to the duties of the proposed employment was indicative of sexual bias. If a man applied for a job that required him to run around the countryside with a bunch of women, he might very well be asked what his wife's reaction would be. Family discord that is job related has an inevitable deleterious effect on employee performance, regardless of whether the employee is a man or a woman. Whether or not the question was proper, the fact remains that plaintiff was seeking employment, not carrying on a battle for women's rights. Plaintiff stated in her deposition that the newspapers accused her of being abrasive in the interview, and she did not dispute this characterization. She said that if she was abrasive it was because she was antagonized. However, regardless of the cause, abrasiveness does not win offers of employment.
 
 
 65
 In another well-accepted work dealing with employment interviews, Make Your Job Interview a Success, the author, J.I. Biegeleisen, states, "It is a known fact that the candidate who comes out of the interview with a job offer is not necessarily the one best qualified technically, important an attribute as that may be, but the one who makes the best impression." Id. at 94. When Douglas Newbold, a member of the interviewing committee, was asked what factors led him to favor Wagner as a candidate, he testified:
 
 
 66
 Well, several things: his--the fact that he had experience supervising employees, that he had I--I would consider it a substantial amount of experience in the military, and that he came across in the interviews, primarily, I suppose, made--probably was the biggest factor. He just seemed to be the kind of person that we were looking for to--to work with to fill the position. He seemed honest, he seemed soft-spoken, he seemed tactful; you felt that you could rely on what he told you.
 
 
 67
 And since the supervision was kind of distant, you know, on a month-by-month basis, it seemed that it was important that we had somebody we could rely on to operate the office.
 
 
 68
 I believe that the district court should have recognized the Committee's right to rely on these criteria, criteria that plaintiff obviously did not satisfy.
 
 
 69
 I agree that Mr. Greene's questions concerning plaintiff's proposed or possible pregnancies were improper and should not have been asked. However, as pointed out at the outset of this opinion, there was no way in which Mr. Greene or any other individual supervisor could have been prevented from asking these questions or punished for so doing. Although conceivably it might be argued that Greene's words were binding on the small town of Stockbridge where he was the elected supervisor, they cannot be said to represent the policy or the will of the other 63,000 inhabitants of Madison County who had no say whatever in Greene's election or his presence on the Board of Supervisors. Where, as here, controlling law limits the County's authority over individual supervisors, the County cannot be held responsible for their unauthorized conduct. See Jett v. Dallas Independent School Dist., --- U.S. ----, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); City of St. Louis v. Praprotnik, 485 U.S. 112, 124-31, 108 S.Ct. 915, 924-28, 99 L.Ed.2d 107 (1988); Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir.1988), cert. denied, 488 U.S. 1014, 109 S.Ct. 805, 102 L.Ed.2d 796 (1989).
 
 
 70
 The record is devoid of evidence that Madison County has a history or policy of discriminating against women. When defense counsel attempted to prove the absence of such discrimination, the district court erroneously prevented him from so doing. The undisputed fact remains that plaintiff was employed by the County prior to the incident in question and was in the tenth year of her employment at the time of trial. The district court prohibited defense counsel from inquiring of her whether she had ever been discriminated against. We know from her testimony at deposition and from the fact that her counsel objected to the question that the answer if given would have been "No".
 
 
 71
 In my opinion, the district court erred as a matter of both fact and law in holding that the members of Madison County's Board of Supervisors were guilty of sex discrimination. I would reverse the judgment in plaintiff's favor. Needless to say, I concur in my colleagues' disposition of plaintiff's cross-appeal.
 
 
 
 [1]
 Oneida, which is an incorporated city with a population of 11,000, elects three supervisors