Joyce **BROOKS, Plaintiff,**

v.

**FONDA–FULTONVILLE CENTRAL SCHOOL DISTRICT,**
Defendant.

No. 94–CV–1575.

United States District Court,
N.D. New York.

Aug. 30, 1996.

Crane, Kelley Green & Parente (David M. Cherubin, of counsel), Albany, NY, for Plaintiff.

Ruberti, Girvin & Ferlazzo (Jeffrey D. Honeywell, of counsel), Albany, NY, for Defendant.

## MEMORANDUM—DECISION AND ORDER

HURD, United States Magistrate Judge.

## I. INTRODUCTION

The plaintiff, Joyce Brooks ("Brooks"), filed her complaint on December 7, 1994. Brooks alleges that the defendant Fonda–Fultonville Central School District ("School District") discriminated against her in employment because of her sex, in violation of 42 U.S.C. § 2000e. Specifically, plaintiff alleges that she was not given a permanent position as a cleaner in the School District because she is a woman. Brooks further alleges that she was fired from her temporary position in retaliation after she complained of the alleged discrimination to the Superintendent of Schools.

## II. *TRIAL*

A two-day bench trial was conducted on January 24–25, 1996, in Utica, New York. The court reserved decision on all claims.

The plaintiff testified on her own behalf. Timothy Davis ("Davis") and Charlene Pollock–Gibson ("Pollock–Gibson") also testified in support of the plaintiff. In addition, William D. Higgins ("Higgins"), the Superintendent of Schools for the School District, and Daniel Szabo ("Szabo") were called as hostile witnesses by the plaintiff. George Kearns, George Rose, and Szabo all testified on behalf of the defendant. In addition to the exhibits, including stipulated exhibits, received in evidence, the parties filed Proposed Findings of Fact and Conclusions of Law on June 4 and 5, 1996.

Based upon all of the evidence and the credibility of the witnesses, the court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52, Federal Rules of Civil Procedure.

## III. *FINDINGS OF FACT*

Plaintiff is a woman, and the School District is an employer within the meaning of 42 U.S.C. § 2000e. At the time of the incidents in question, Szabo was employed by the defendant School District and held the position of Superintendent of Buildings and Grounds. As such, Szabo had the authority to hire and fire temporary employees in the area of Buildings and Grounds. However, Szabo did not have the power to hire full-time permanent cleaners. An applicant for a permanent position would have to meet the approval of the Board of Education. In order to be considered by the board, an applicant generally needed the recommendation of either Szabo, the business manager, and/or Higgins, the Superintendent of Schools.

Some time in 1989, Brooks approached Szabo and inquired about possible employment opportunities in the custodial or maintenance divisions within the School District. Szabo informed Brooks that in order to be considered for any position within the School District, she would have to file an application, which she did on July 31, 1989. This application was a formal application for any permanent opening within the School District. It remained on file with the School District throughout the events giving rise to this litigation. In August of 1990, Szabo contacted Brooks about an opening in the School District as a temporary full-time substitute cleaner. Brooks was hired for that position on August 27, 1990. The temporary opening occurred as the result of a dispute over the termination of Thomas Hoffman ("Hoffman") who had filed a grievance against the School District. Brooks was aware that if Hoffman were to return to his permanent position, her temporary position would most likely be eliminated. If, on the other hand, Hoffman did not return to work, Brooks was informed during her employment that she would be recommended by Szabo to the Board of Education for a permanent full-time cleaner position.

The school consists of one large building which houses all students from kindergarten through the twelfth grade. Cleaners and other custodial and maintenance personnel employed by the School District are assigned to various shifts and assigned to specific areas of the building for cleaning responsibilities by Szabo. Most cleaners are assigned to the night shift which commences at 3:00 p.m. and ends at 11:00 p.m. Cleaners assigned to this shift have individual areas assigned to them for which they are responsible. Cleaning assignments are set during the summer for the upcoming school year and generally do not change until the following summer. Brooks normally worked the 3:00 p.m. to 11:00 p.m. shift and was assigned to clean an area in the elementary wing of the building. The only time that Brooks did not work from 3:00 p.m. to 11:00 p.m. was when she took a seasonal position with the Department of Transportation from October 1990 through March 1991. During that time, Szabo accommodated her request to modify her work schedule, and Brooks worked at the School District from 10:45 p.m. to 2:45 a.m. and her daughter, also an employee of the School District, worked the other four hours of the shift. In March or April of 1991, plaintiff returned to the normal 3:00 p.m. to 11:00 p.m. shift. Overall, Szabo was pleased

with the plaintiff's work and considered her to be one of the better cleaners.[1]

Effective February 15, 1991, John Cranker ("Cranker"), also an employee of the School District, resigned his employment as a permanent full-time cleaner. Cranker was assigned to the "pool area" and his resignation subsequently created an opening in that division. The pool was located in the basement or cellar of the school building. Cleaning the pool area entails some different tasks than other areas of the building. For example, the cleaner responsible for the pool area has to operate a "dry-a-thon" machine, clean hair and lint filters, foam wash the area, and fill the chlorine and muriatic acid tanks. According to Szabo, training an individual to perform these duties takes approximately one full week. There was no reason why the pool position needed to be filled by a man. Plaintiff was fully qualified for the pool cleaning job.

Shortly after learning of Cranker's resignation in early February of 1991, Brooks expressed to Szabo an interest in obtaining that permanent position. Szabo responded by saying that "he would never put a woman in that area to clean." (Tr. Jan. 24, 1996 at 34). When asked why, Szabo stated it was "because he didn't want a woman in the cellar." (Tr. Jan. 24, 1996 at 34). It is clear to the court that at that point in time, the plaintiff was unaware of her rights regarding gender discrimination. Further, Brooks was intimidated by Szabo and did not want to create tension between them since his recommendation was pivotal if she were to obtain permanent employment. Moreover, it is apparent that although the plaintiff would have taken the permanent pool area position, she was hoping that the Hoffman dispute would be resolved and that she could continue working in her current work assignment, but as a permanent rather than temporary employee. Shortly after his conversation with Brooks, Szabo hired Mr. Francis Bell ("Bell"), a life-long friend, as a temporary cleaner in the pool area. Although Szabo had been accommodating to the plaintiff in the past, it is clear that his desire to have a man in the pool area position and his wish to assist a friend overruled any further assistance he was willing to give Brooks.

During the next three months, Brooks waited for the permanent pool area position to be posted. Although Bell had been selected for the temporary position, Brooks was satisfied that the permanent position was still open. However, the defendant never made the required public posting of the position. On April 30, 1991, the plaintiff learned that Bell was hired to fill the permanent pool area position. On May 1, 1991, the day after Bell was hired as a permanent cleaner, at the suggestion of her coworkers Pollock–Gibson and Davis, Brooks went to speak with Superintendent Higgins. In an effort to avoid any controversy between herself and Bell, before talking to Higgins, Brooks informed Bell that she was going to talk to Higgins and express her feeling that it was unfair that Bell had received the permanent pool area position.

Brooks notified Higgins of what was happening and that Szabo refused to hire a woman to clean the pool area. At trial, Higgins claimed that his recollection of the conversation with the plaintiff was "hazy" and that all he could remember was that there "seemed to be some conflict between Ms. Brooks and Mr. Szabo," and that the only thing Brooks wanted to discuss was an increase in her salary. (Tr. Jan. 24, 1996 at 125). In fact, at one point in his testimony, Higgins even denied that any such conversation took place with Brooks after Bell was hired for the permanent position. The court finds it persuasive that Brooks took the time to inform Bell that she was going to Higgins and complain that it was unfair for Bell to receive the permanent pool area position. First, it shows that a conversation between Brooks and Higgins must have taken place. Otherwise, why would plaintiff talk to Bell? Second, it also illustrates that Brooks voiced her opinion about the unfairness in not receiving the permanent position because of her gender, even before talking to Higgins. Had, in fact, the Brooks/Higgins conversa-

---

1. For example, when asked his opinion of the plaintiff's work performance, Szabo testified that: "She was probably one of the better clean-

ers in just a short time." (Tr. Jan. 24, 1996 at 140.)

tion been merely about her salary or earnings, as Higgins suggests, Brooks would have had no reason to inform Bell of her plans to speak to the Superintendent about the fairness of Bell's appointment. Bell, the lifelong friend of Szabo's, was never called by the defendant to refute either the fact or the content of Brooks' conversation with him prior to her seeing Higgins.

On May 2, 1991, Brooks did not report to work because of illness. When she reported to work on Friday, May 3, 1991, Szabo called Brooks into his office. Szabo became very upset and yelled at her asking, "Who the hell [do you think you are] going to Mr. Higgins?" (Tr. Jan 24, 1996 at 39). From this evidence, it is apparent that Higgins had contacted Szabo about the conversation between Brooks and himself. The mere fact that Szabo knew of the conversation between Brooks and Higgins strongly supports the plaintiff's assertions. Neither Higgins nor Szabo suggested that Higgins had not informed Szabo of the plaintiff's allegations of discrimination.

Szabo said other things including, "I told you before I would never put a woman in that area to clean." (Tr. Jan 24, 1996 at 39). Szabo further told Brooks that she would not receive a raise in salary and that she would never be hired as a permanent cleaner because he would never recommend her for a position. Brooks then briefly left the room because she was upset. Upon her return, Szabo shouted at her again. Brooks asked Szabo if she was fired. In response, Szabo asked, "Is that what you want?" To which she responded "no" and that "he would not aggravate her into quitting." (Tr. Jan 24, 1996 at 41). Szabo then told her that "she was insubordinate," and that she was to "get out of the building." (Tr. Jan 24, 1996 at 41). The plaintiff then gathered her belongings and left the building under the impression that she had been fired.

Sometime over the weekend, Brooks contacted Rick Raco ("Raco"), a member of the school board, and told him what had happened. Raco told Brooks to contact Higgins on Monday. On Monday, May 6, 1991, at approximately 8:00 a.m., Brooks contacted Higgins by telephone. Brooks informed Higgins of the events of Friday, May 3, 1991, and Higgins said that he would contact Szabo and call her back. After three hours, Brooks called Higgins again and was informed by his secretary that Szabo would get back to her shortly. Approximately 45 minutes later, Szabo called Brooks and told her that she "wasn't to come back and that it was to go his way, that [she] wasn't to have a job there." (Tr. Jan. 24, 1996 at 46). When Brooks told Szabo that she was going to go to the unemployment office, he responded that he did not care. Brooks heard nothing further from Szabo or the School District.

The defendant did not produce any records indicating the reason Brooks left her employment with the School District. For the next fifty-two weeks, Brooks collected unemployment benefits which went unchallenged by the defendant. Brooks was fired from her temporary position.

Timothy Davis was a coworker of Brooks and is currently employed by the defendant. The same day of the May 3, 1991 confrontation between Brooks and Szabo, he asked Szabo what had happened. Szabo stated that he told her "to get the hell out of there and that he was done with her," and added "that it would be a cold day in hell before he would hire her." (Tr. Jan 25, 1996 at 213–14). In a subsequent conversation with Szabo, when Davis asked why Szabo did not hire Brooks for the pool area, he stated it was "because he didn't want to put a woman in the pool area." (Tr. Jan 25, 1996 at 216). Charlene Pollock–Gibson is also a former coworker of Brooks who is also currently employed by the School District. When Pollock–Gibson asked Szabo why a woman could not clean the pool area, Szabo responded that "[h]e didn't think this was a place for a woman to be cleaning at that time." (Tr. Jan 25, 1996 at 235). The court finds the testimony of Davis and Pollock–Gibson extremely credible since they are both still employed by the School District, report directly to Szabo, and face potential anger and/or retaliation for their testimony.

On September 16, 1991, Brooks filed a formal complaint with the New York State Division of Human Rights alleging that she was denied a permanent full-time position

based upon her gender. The New York Division of Human Rights then filed the complaint with the Equal Employment Opportunity Commission (EEOC). On January 12, 1995, Brooks received a "right to sue" letter from the EEOC and the New York State Division of Human Rights dismissed her complaint for administrative convenience pending the outcome of this action.

## IV. CONCLUSIONS OF LAW

Plaintiff brings two causes of action in this case. First, Brooks claims that she was unlawfully discriminated against when the defendant refused to offer her a permanent cleaning position in the pool area because of her gender. Second, Brooks claims that the defendant unlawfully retaliated against her when she was fired from her position as a temporary full-time cleaner. Each of these claims will be addressed in turn.

### A. Unlawful Discrimination Claim

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, states in pertinent part:

(a) it shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . .

The purpose of Title VII is to "eliminate[ ] certain bases for distinguishing among employees while otherwise preserving employers' freedom of choice." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 239, 109 S.Ct. 1775, 1784–85, 104 L.Ed.2d 268 (1989). Recognizing the difficulty of proving discrimination—a claim based on the employer's state of mind—while simultaneously preserving employer prerogatives, the Supreme Court has developed two analytical frameworks which allocate the burden of proof so as to balance these interests. Generally, there are two types of discrimination claims; the first involves a claim that includes indirect evidence of unlawful discrimination, and the second involves direct evidence of discrimination.

### 1. Indirect Evidence—"Pretext" Analysis

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court developed the framework for proving intentional discrimination in the absence of direct evidence. In order for a Title VII plaintiff to establish a claim through indirect evidence, a prima facie case of discrimination must be proved by a fair preponderance of the evidence. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *see also Price Waterhouse,* 490 U.S. at 271, 109 S.Ct. at 1801–02 (O'Connor, J., concurring) ("the entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by.") In a "pretext" case, a plaintiff must show four essential elements.

In order to establish the prima facie case, plaintiff must demonstrate that: (i) [s]he is a member of a protected class; (ii) [s]he was qualified for the position; (iii) [s]he was subjected to an adverse employment decision; and (iv) either the position remained open or [s]he was replaced by someone not a member of [her] protected class.

*de la Cruz v. New York City Human Resources Administration Dept. of Social Services,* 82 F.3d 16, 20 (2d Cir.1996) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Owens v. New York City Hous. Auth.,* 934 F.2d 405, 408–09 (2d Cir.), cert. denied, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991); *Sweeney v. Research Found. of State Univ. of New York,* 711 F.2d 1179, 1184–85 (2d Cir.1983)).

The Second Circuit has recently clarified the burden placed upon plaintiffs to establish a prima facie case of gender discrimination. "[A] female plaintiff must show that she was qualified for the position, that her employer discharged her, and that the employer sought or hired a male to replace her." *Cook v. Arrowsmith Shelburne,* 69 F.3d 1235, 1239 (2d Cir, 1995) (citing *McDonnell Douglas,*

411 U.S. at 802 and n. 13, 93 S.Ct. at 1824 and n. 13 (1973); *Burdine,* 450 U.S. at 253–54 and n. 6, 101 S.Ct. at 1093–94 and n. 6; *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir.1994)). "The plaintiff must prove by a preponderance of the evidence, that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094.

Establishment of a prima facie case, however, merely raises an inference of discrimination, and "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. Once the plaintiff has proven a prima facie case of discrimination, the burden then shifts to the defendant "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Id.* Once the defendant offers this type of evidence, the *McDonnell/Burdine* presumption drops from the case. *U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). The plaintiff must then persuade the Court that the defendant's proffered reasons were merely a pretext, *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095, and therefore, that she was the victim of intentional discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Thus, under the *McDonnell/Burdine* framework the question asked is "whether the legitimate reason was *the* 'true reason' for the decision." *Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1788–89.

### 2. *Direct Evidence—"Mixed Motive" Analysis*

Since the premise of the *McDonnell/Burdine* pretext analysis is "that *either* a legitimate *or* illegitimate set of considerations led to the challenged decision," *id.,* that framework is inappropriate in cases where there is direct evidence that a discriminatory criterion played a part in the employment decision. *Price Waterhouse,* 490 U.S. at 246–47, 109 S.Ct. at 1788–89; *Trans World Airlines, Inc.*

*v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985); *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1568 (2d Cir.1989). "In a 'mixed motive' case, a plaintiff must initially proffer evidence that an impermissible criterion was *in fact* a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz,* 82 F.3d at 23 (citing *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1794–95, *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1181 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992)). The plaintiff must also show that had the discriminatory intent been absent, a different decision would have been made. *Price Waterhouse,* 490 U.S. at 250, 109 S.Ct. at 1790–91; *Berl v. County of Westchester,* 849 F.2d 712, 714–15 (2d Cir. 1988); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–86, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977) (dual motivation/same decision test).

In order to avoid liability then, the employer has the burden of proving by a preponderance of the evidence that the plaintiff would have been discharged or rejected regardless of the discriminatory criterion. *Price Waterhouse,* 490 U.S. at 242, 109 S.Ct. at 1786. By thus analyzing the employer's motives, both the employee's Title VII rights and the employer's prerogatives are protected. Admittedly, this analytical framework places a heavier burden on the defendant than *Burdine;* but it is reserved, rightfully so, for those cases in which there is direct evidence of discrimination in the employment decision.

Thus, in a Title VII discriminatory treatment case, the fact-finder must first determine whether to apply a "pretext" or a "mixed motive" analysis. *Price Waterhouse,* 490 U.S. at 247, n. 12, 109 S.Ct. at 1789, n. 12. *Barbano v. Madison County,* 922 F.2d 139, 142 (2d Cir.1990). If the plaintiff has demonstrated through direct evidence that a discriminatory criterion played a part in the challenged employment decision, then the mixed motive analysis of *Price Waterhouse* applies. Accordingly, the burden shifts to the employer to prove by a preponderance of the evidence that "its legitimate reason, standing alone, would have induced it to make the same decision" at the time the

decision was made. *Price Waterhouse*, 490 U.S. at 252, 109 S.Ct. at 1791–92; *Barbano*, 922 F.2d at 145. Thus, in cases where there is direct evidence of discrimination, the fact-finder need not ever reach the question of "pretext." *Grant*, 880 F.2d at 1568. Alternatively, if the plaintiff cannot offer direct evidence of discrimination, the court must give her the opportunity to prove intentional discrimination through indirect evidence under the *McDonnell/Burdine* "pretext" analysis. *Price Waterhouse*, 490 U.S. at 247, n. 12, 109 S.Ct. at 1789, n. 12; *id.* at 278, 109 S.Ct. at 1805 (O'Connor, J., concurring). In other words, if the plaintiff meets the initial burden of the mixed motive analysis by presenting direct evidence of discrimination, then the fact-finder need not engage in a "pretext" analysis. Therefore, the "key inquiry" at this point, is whether there is direct evidence that the "impermissible criterion played some part in the decision-making process." *Barbano*, 922 F.2d at 145.

### 3. *Title VII Claim*

In the instant case, Brooks has offered direct evidence of a discriminatory intent on the part of the defendant. The plaintiff and two corroborating witnesses have testified to the fact that Szabo stated he would not hire a woman to clean the pool area. Therefore, the case before this court is of the second type, and thus requires a "mixed-motive" analysis. As discussed earlier, this court is therefore not obligated to engage in a "pretext" analysis. Under the "mixed-motive" analysis, Brooks is obligated to "proffer evidence that an impermissible criterion was *in fact* a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz*, 82 F.3d at 23.

▮ As discussed earlier, the plaintiff has in fact proffered direct evidence that gender discrimination was involved in the employment decision of the School District. First, Brooks herself testified that when she asked Szabo about the pool cleaner position, he informed her that "he would never put a woman in that area to clean ... because he didn't want a woman in the cellar." (Tr. Jan 24, 1996 at 34). Second, Davis, a current employee of the School District, testified that

Szabo told him that "he didn't want to put a woman in the pool area." (Tr. Jan 25, 1996 at 216). Third, Pollock–Gibson who is also currently employed by the defendant, testified that Szabo told her that "[h]e didn't think [the pool area] was a place for a woman to be cleaning at that time." (Tr. Jan. 25, 1996 at 235).

Furthermore, it is clear from the evidence presented that Szabo's decision was not based on Brooks' qualifications to perform the job. Szabo testified that Brooks was "probably one of the better cleaners in just a short time." (Tr. Jan. 24, 1996 at 140). The plaintiff also received praise for her cleaning work in the elementary wing prompting one teacher to tell Brooks and Szabo that her room had never been cleaned as well before. Moreover, although cleaning the pool area involved some different tasks including working with filter systems and chemicals, Szabo testified that it would only take approximately one week to train someone to fill that position. Thus, the plaintiff has met the burden of establishing that an impermissible criterion, specifically her gender, was the motivating factor behind the defendant's decision.

The defendant asserts that plaintiff cannot establish a "mixed-motive" claim because the School District did not in fact reject her for the permanent pool area position. In other words, as their defense to the second prong of the "mixed-motive" claim which requires the defendant to demonstrate that it would have made the same employment decision absent the impermissible factor, defendant contends that because the plaintiff chose not to seek the permanent position, no discriminatory employment decision was made. The court does not agree.

The defendant points to Szabo's testimony that in a conversation following the opening of the permanent pool area position, Brooks declined interest and would not even go into the cellar to review the job requirements. As noted above and in the Findings of Fact, the court has rejected Szabo's version and accepted Brooks' version of that conversation, and in fact, he told her she would not be offered the position because she was a woman. In addition to being supported by Sza-

bo's admissions to two independent witnesses, the question remains, if Brooks was not interested, why would they have had an extensive conversation about the permanent pool area position?

The defendant further argues that Brooks never applied for the permanent pool area position, nor complained about Szabo's behavior until after Bell received the permanent appointment. In the first place, she did have an application with the defendant that covered any permanent cleaning position. She waited to complain out of ignorance of her rights regarding gender discrimination, intimidation, and because she knew that Szabo's recommendation was imperative to obtain any permanent appointment. Further, she knew Bell only had a temporary appointment, and she was waiting for the required notification of a public posting for the permanent position. There is no credible evidence that the defendant made a public posting prior to Bell's appointment.

Finally, the immediate uncontroverted acts of Brooks upon learning of Bell's permanent appointment, are not the acts of someone who did not wish to be considered for the position. She conferred with two fellow employees. She advised Bell that she was going to the Superintendent about his appointment. She complained to the Superintendent about her conversation with Szabo, the unfairness of the appointment, and her earnings. Brooks may have preferred the "Hoffman" position, but since that was not available between February and April of 1991, she wanted the permanent pool area position, and under the circumstances, made her wishes known to the defendant.

Thus, the defendant has failed to illustrate to the court that "its legitimate reason, standing alone, would have induced it to make the same decision" at the time the decision was made. *Price Waterhouse*, 490 U.S. at 252, 109 S.Ct. at 1792; *Barbano*, 922 F.2d at 145. Here, the defendant's legitimate reason, that it did not reject Brooks, is untenable. Furthermore, the fact that a man, Bell, was hired for the pool area position is a final brick in the plaintiff's case. The court is satisfied that the plaintiff has established that she was impermissibly discriminated against because of her gender when she was not given the permanent position.

## B. *Retaliation Claim*

■ Plaintiff asserts that the School District retaliated against her for reporting to Szabo's supervisor, Superintendent Higgins, that she was being discriminated against because of her gender. Alleging discrimination to an employer is a protected action under Title VII of the Civil Rights Act of 1964. The legal standards for retaliation are identical to those of other Title VII claims.

■ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, states in pertinent part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this title...." 42 U.S.C. § 2000e–3(a). "The phrase 'opposed any practice' encompasses an individual's complaints to supervisors regardless of whether she also files an E.E.O.C. charge." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 55 (2d Cir.1993), *cert denied*, —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *James v. Runyon*, 843 F.Supp. 816 (N.D.N.Y.1994), *aff'd* 47 F.3d 1158 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 126, 133 L.Ed.2d 75 (1995).

"Title VII eliminates certain bases for distinguishing among employees while otherwise preserving employers' freedom of choice." *Price Waterhouse*, 490 U.S. at 239, 109 S.Ct. at 1784–85. Recognizing the difficulty of proving a Title VII claim of retaliation—claims based on the employer's state of mind—while simultaneously preserving an employer's prerogatives, the Supreme Court has developed two analytical frameworks which allocate the burden of proof so as to balance these interests. These frameworks—those of "pretext" and "mixed-motive"—are identical to those used in addressing discrimination which was discussed in detail earlier. The court is of the opinion that direct evidence of retaliation exists in this case. However, an analysis of both the

indirect "pretext" and direct "mixed motive" approaches are presented.

### 1. *Direct Evidence—"Mixed Motive" Analysis*

■ In the instant case, Brooks has offered direct evidence of a discriminatory intent on the part of the defendant. The plaintiff testified to the fact that Szabo yelled at her "[W]ho the hell [do you think you are] going to Mr. Higgins?" (Tr. Jan 24, 1996 at 39) Therefore, the case before this court is of the second type and thus requires a "mixed-motive" analysis. Under the "mixed-motive" analysis, Brooks is obligated to "proffer evidence that an impermissible criterion was *in fact* a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz*, 82 F.3d at 23. This court holds that the reason why Brooks was terminated by Szabo was because she complained about Szabo's failure to consider her for the pool cleaning position due to her gender.

■ In order to avoid liability then, the burden of proof shifts to the employer to prove by a preponderance of the evidence that plaintiff would have been discharged even if it had not considered retaliation. *Price Waterhouse*, 490 U.S. at 242, 109 S.Ct. at 1786; *Grant*, 880 F.2d at 1568.[2] By thus analyzing the employer's motives, both the employee's Title VII rights and the employer's prerogatives are protected. Once again, this analytical framework places a heavier burden on the defendant than *Burdine;* but it is reserved, rightfully so, for those cases in which there is direct evidence of retaliation in the employment decision.

■ The defendants have failed to prove by a preponderance of the evidence that Brooks would have been discharged despite retaliation. Rather, the School District submits that Brooks voluntarily left her position. As discussed earlier, the court finds that Brooks was discharged. "An actual discharge, in the context of Title VII as in other contexts, occurs when the employer uses language or engages in conduct that 'would logically lead a prudent person to believe his tenure has been terminated.'" *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87–88 (2d Cir.1996) (quoting *NLRB v. Trumbull Asphalt Co.*, 327 F.2d 841, 843 (8th Cir.1964); *NLRB v. Hale Mfg. Co.*, 570 F.2d 705, 708 (8th Cir.1978) (whether an employee has been discharged depends on the reasonable inference an employee could draw from what her employer said)). In addition, the "[i]nquiry focuses on the reasonable perceptions of the employee, not on whether formal words of firing were in fact spoken." *Id.* (citing *NLRB v. Ridgeway Trucking Co.*, 622 F.2d 1222, 1224 (5th Cir.1980); *Trumbull Asphalt*, 327 F.2d at 843).

Applying these concepts, the court notes that first, Szabo was extremely upset that Brooks spoke with Higgins regarding the pool area position. Second, Szabo told her to leave the building because she was being "insubordinate." (Tr. Jan 24, 1996 at 41). Third, when Brooks attempted to contact Higgins regarding her termination, he had Szabo call her back who explained to her that she "wasn't to come back." (Tr. Jan 24, 1996 at 46). Again, the court rejects Szabo's version of both confrontations. Finally, Brooks collected unemployment benefits, to which the defendant contributed and did not contest, for the next fifty-two weeks. Had Brooks voluntarily left her position, she would not have been eligible to collect unemployment benefits. Thus, the School District may have avoided the financial burden of contributing to the plaintiff's unemployment benefits by asserting that Brooks quit her position. This it did not do because plaintiff was fired. The court further notes that Bell's girlfriend, Evelyn Edwards, at Szabo's recommendation, eventually received Hoffman's permanent position as a cleaner after the opening was created by the plaintiff's firing and the resolution of the Hoffman grievance.

---

2. In other words, "once the employee proves that the illegitimate reason [retaliation] played a part in the employer's motivation, the employer loses unless the employer can persuade the fact-finder that the adverse action would have been taken even in the absence of the illegitimate reason." *Davis v. State University of New York*, 802 F.2d 638, 644 (2d Cir.1986) (Newman, C.J., concurring).

Since the defendant has failed to meet the burden of providing a legitimate reason for her discharge other than retaliation, plaintiff must prevail on her retaliation claim.

### 2. *Indirect Evidence—"Pretext" Analysis*

Although the court has determined that direct evidence of retaliation exists, the same end result would be reached if the alternative indirect "pretext" analysis were applied. To review, in *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817 (1973), and later in *Texas Dep't of Community Affairs,* 450 U.S. 248, 101 S.Ct. 1089 (1981), the Supreme Court developed the three-part burden shifting framework for proving intentional discrimination in the absence of direct evidence.

■ In order for a Title VII plaintiff to establish a claim through indirect evidence, a prima facie case of retaliation must be proved by a fair preponderance of the evidence. *Id.* at 252–53, 101 S.Ct. at 1093–94; *see also Price Waterhouse,* 490 U.S. at 271, 109 S.Ct. at 1801–02 (O'Connor, J., concurring) ("The entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of [retaliation] is hard to come by.") Proving a prima facie case of retaliation diverges from the normal discrimination analysis. Whereas, in a claim for discrimination, the plaintiff must prove that: "(i) [s]he is a member of a protected class; (ii) [s]he was qualified for the position; (iii) [s]he was subjected to an adverse employment decision; and (iv) either the position remained open or [s]he was replaced by someone not a member of [her] protected class," *de la Cruz,* 82 F.3d at 20, proving a prima facie case of retaliation calls for slightly different factors to be shown (although the factors ultimately result in the same points being made).

■ In order to show a prima facie case of retaliation, plaintiff must establish the following factors: (1) her participation in a protected activity that was known to the defendant; (2) an employment action at the time of, or after the protected conduct occurred, that disadvantaged her; and (3) a causal connection between the protected activity and the adverse employment action. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir. 1995) (citing *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 64 (2d Cir.1992)).

■ Proof of a causal connection between the protected activity and the adverse employment action can be established "indirectly, by showing that the protected activity was followed closely by [the alleged retaliatory action], or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct; or directly, through evidence of retaliatory animus directed against plaintiff by the defendant." *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (quoting *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.), *cert. denied* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987)).

■ Therefore, a prima facie case that plaintiff was terminated in retaliation for reporting gender discrimination may be found if the following four facts are shown: (1) that plaintiff engaged in a "protected activity," i.e., complaining about gender discrimination to a supervisor; (2) that the defendant was aware of plaintiff's complaint; (3) that plaintiff was terminated; and (4) that plaintiff's complaint was followed by her termination. *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993); *see also Thermidor v. Beth Israel Medical Ctr.,* 683 F.Supp. 403, 411 (S.D.N.Y.1988).

■ Addressing the four factors in turn, the court finds that Brooks did in fact complain to Superintendent Higgins that she was being discriminated against because, as a woman, she was not being considered for the permanent position in the pool area. Second, the School District was aware of the complaint since it was made directly to Higgins. Third, as discussed earlier, the plaintiff was terminated. Finally, the plaintiff's termination occurred directly after she complained about the gender discrimination to Higgins.[3]

---

**3.** The exact time of plaintiff's termination is somewhat unclear. Brooks was fired either Friday, May 3, 1991, the day she spoke with Szabo in person after reporting to work, or on Monday,

■ Just as in a case of discrimination, establishment of a prima facie case of retaliation merely raises an inference of retaliation, and "in effect creates a presumption that the employer unlawfully [retaliated] against the employee." *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. Once the plaintiff has proven a prima facie case of retaliation, the burden of production then shifts to the defendant "to rebut the presumption of retaliation by producing evidence that the plaintiff was [terminated] for a legitimate ... reason." *Id.* The defendant's legitimate reason for the events which occurred were that Brooks voluntarily left her position and was not terminated.

■ Normally, once the defendant offers evidence of a legitimate reason for the events which occurred, the *McDonnell/Burdine* presumption of retaliation drops from the case. *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1481–82. The plaintiff must then persuade the Court that the defendant's proffered reason was merely a pretext,[4] and that she was the victim of retaliation. *St. Mary's Honor Ctr,* 509 U.S. at 506, 113 S.Ct. at 2746–47 (the plaintiff retains the ultimate burden of persuading the trier of fact that she has been the victim of retaliation).

However, in the instant case, the only offer of explanation by the defendant is that the plaintiff was not terminated. Essentially, after establishing a prima facie case, the only thing the defendant contends is that the plaintiff cannot establish a prima facie case. This is insufficient since the court has determined that the plaintiff was in fact terminated from the temporary position. The plaintiff has established her prima facie case of retaliation. Therefore, the defendant has

failed to meet their burden of offering a legitimate reason for terminating the plaintiff and Brooks must prevail in her retaliation claim.

## C. *Remedy*

■ The events being considered in this cause of action occurred in April and May of 1991. Although the amendments to Title VII contained in the Civil Rights Act of 1991 expand the remedy available to plaintiffs, the events in this case occurred prior to the enactment date of the Act.[5] Since the amendments are not retroactive, the damages available to the plaintiff are those which were available prior to the enactment of Title VII contained in the Civil Rights Act of 1991.[6] *Postema v. National League of Professional Baseball Clubs* 998 F.2d 60 (2d Cir.1993) (provisions of Civil Rights Act of 1991 conferring right to trial by jury and allowing recovery of compensatory and punitive damages did not apply retroactively to claim arising before Act's effective date); *Wisdom v. Intrepid Sea–Air Space Museum* 993 F.2d 5 (2d Cir.1993). Plaintiffs are thus limited in the types of damages that they may recover. Specifically, neither punitive nor compensatory damages are recoverable under Title VII claims. *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1363–64 (11th Cir. 1982); *Mason v. Connecticut,* 583 F.Supp. 729 (D.Conn.1984). Following from this exclusion, awards of pain and suffering may not be awarded. *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 581 (2d Cir. 1989).

May 6, 1991, the day Szabo called her on the phone to inform her that she was not to return to work. In any event, the statements by Szabo on either date would constitute a discharge. Taken together, the meaning and intent is clear and undeniable. Both occurred within a few days of the time Brooks complained to Higgins about Szabo's discriminatory activity.

4. Plaintiff must demonstrate that the reason is pretextual "either directly by persuading the court that [retaliation] more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

5. The effective date of the 1991 amendments to 42 U.S.C. § 1981 and Title VII is the date of the enactment of the law which was November 21, 1991.

6. Section 109(c) of Pub.L. 102–166 provided that: "The amendments made by this section [amending subsec. (f) of this section and sections 2000e–1, 12111 and 12112 of this title] shall not apply with respect to conduct occurring before the date of the enactment of this Act [Nov. 21, 1991]."

■ Upon a finding of liability, plaintiffs are entitled to back pay from the date of termination until the date of judgment, including prejudgment interest on the back pay award. *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 144–45 (2d Cir.1993), *cert. denied*, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). In addition, because a back pay award is designed to make an injured party whole, the "award should therefore consist of lost salary, including anticipated raises, and fringe benefits." *Id.* at 145. Any order for back pay must be reduced by "[i]nterim earnings or amounts earnable with reasonable diligence." 42 U.S.C. § 2000e–5(g). Brooks is also entitled to costs and reasonable attorney fees. *See Texas State Teachers' Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

■ In addition, the court can grant an award of reinstatement to the plaintiff's position as a full-time permanent cleaner with the School District. *See · Sagendorf-Teal v. County of Rensselaer*, 904 F.Supp. 95, 99 (N.D.N.Y.1995); 42 U.S.C. § 2000e–5(g). In the alternative, the court has discretion to award plaintiff front pay, and it is not an abuse of discretion if the court finds that back pay is sufficient. *Saulpaugh*, 4 F.3d at 145; *Barbano*, 922 F.2d at 147. Such a front pay award can be granted where equitable relief in the form of reinstatement may not be feasible or appropriate because the job no longer exists, or the employer-employee relationship has been damaged beyond repair.

### 1. Gross Back Pay

Both parties have stipulated to the amount of lost earnings from the time of Brooks' termination through the date of trial. Those amounts with the additional figures for the post trial time period to September 30, 1996 are as follows:

| School Year (7/1–6/30) | | Projected Wages |
|---|---|---|
| 1991 | (3 months at $13,700) | $ 3,425.00 |
| 1991–92 | | 14,300.00 |
| 1992–93 | | 15,476.00 |
| 1993–94 | | 16,742.00 |
| 1994–95 | | 18,103.00 |
| 1995–1/26/96 [7] | | 10,650.50 |
| 1/27–6/30/96 | | 7,810.50 |
| 7/1–9/30/96 [8] | (13 weeks at $376.96) | 4,900.48 |
| | Gross Back Pay | $91,407.48 |

### 2. Interim Earnings

The parties have further stipulated that Brooks has earned the following amounts *during the period following her wrongful termination*. In addition, defendant submits that Brooks earned an additional $1,100 performing in home care after her separation from Amsterdam Memorial Hospital, a fact about which Brooks testified at trial. Since the plaintiff has not offered any explanation regarding these earnings, the court finds that it is appropriate to deduct the sum in question as well as earnings she presumably procured following trial.

| Year | Employer | Wages |
|---|---|---|
| 1993 | Amsterdam Memorial Hospital | $ 7,169.88 |
| 1994 | Amsterdam Memorial Hospital | 14,010.57 |
| 1995 (through 11/24/95) | Amsterdam Memorial Hospital | 11,889.34 |
| 11/25/95—1/24/96 | In Home Care | 1,100.00 |

7. According to plaintiff, the salary for the 1995–96 year is $18,461.00 (Pl.'s Post–Trial Findings of Fact and Conclusions of Law and Mem. Of Law at 14).

8. Because a pay schedule for the 1996–97 year was not provided to the court, the salary for that year has been extrapolated from the pay increases of prior years. The pay increases for the years provided are as follows:

| Year | Salaries | Increase in Salary | Percentage |
|---|---|---|---|
| 1990–1991 to 1991–1992 | $14,300—13,700 | $ 600.00 | 4.38% |
| 1991–1992 to 1992–1993 | 15,476—14,300 | 1,176.00 | 8.22% |
| 1992–1993 to 1993–1994 | 16,742—15,476 | 1,266.00 | 8.18% |
| 1993–1994 to 1994–1995 | 18,103—16,742 | 1,361.00 | 8.13% |
| 1994–1995 to 1995–1996 | 18,461—18,103 | 358.00 | 1.98% |

| Year | Employer | Wages |
|------|----------|-------|
| 1/25/96—9/30/96 | In Home Care | 4,537.50 [9] |
| | Total Interim Earnings | $38,707.29 |

### 3. Alleged Failure to Mitigate Damages

▇▇▇▇ Defendant contends that any award for back pay must end as of November 24, 1995, the date that Brooks voluntarily left her employment at Amsterdam Memorial Hospital. Defendant submits that plaintiff failed to sufficiently mitigate her damages. The burden is upon the defendant to prove that the discriminatee failed to mitigate damages. *Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir.1992); *Bonura v. Chase Manhattan Bank, N.A.*, 629 F.Supp. 353, 356 (S.D.N.Y. 1986). A defendant "'must show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment'" in order to meet its "extremely high" burden of proving failure to mitigate. *Bonura*, 629 F.Supp. at 356 (quoting *EEOC v. Kallir, Philips, Ross, Inc.*, 420 F.Supp. 919, 925 (S.D.N.Y.1976), *aff'd*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977)).

▇▇▇▇ Plaintiff submits that the award of back pay should not end as of November 24, 1995. The reason Brooks left the position at Amsterdam Memorial was because she had arranged to assist an elderly individual with home care at a higher rate of pay than what she was earning at the hospital. Unfortunately for Brooks, the individual expired prior to her beginning her new position. The court finds that the defendant has not met its burden in its' effort to illustrate that Brooks failed in her efforts to mitigate damages. First, Brooks held a position at the Amsterdam Memorial Hospital during the years 1993, 1994, and 1995. Second, plaintiff did not leave that position without having another job which she had acquired. "Although a claimant fails to mitigate damages by voluntarily quitting comparable interim employment for personal reasons, a voluntary quit

does not toll the back pay period when it is motivated by unreasonable working conditions or an earnest search for better employment." *EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir.1992) (citing *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269 (4th Cir.1985)). Thus, the court refuses to toll the back pay award as requested by the defendant.

### 4. Unemployment Insurance Benefits

▇▇▇▇ Defendant submits that the unemployment insurance funds which Brooks collected during the fifty-two week period following her termination should be subtracted from the back pay award. "Unemployment contributions are not 'earnings' for purposes of the section [42 U.S.C. § 2000e–5(g) ]. But the court may deduct them from a back pay award as a matter of equity." *Talada v. International Serv. Sys. Inc.*, 899 F.Supp. 936, 960 (N.D.N.Y.1995) (citing *Williams v. Secretary of the Navy*, 853 F.Supp. 66, 71 (E.D.N.Y.1994) (citing *EEOC v. Enterprise Ass'n Steamfitters Local No. 638*, 542 F.2d 579, 591 (2d Cir.1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977))). "The Second Circuit noted ... [that] pension benefits ... should be offset from a back pay award since the source is the employer himself, whereas the unemployment insurance, 'coming from a collateral source should not serve to reduce a culpable employer's liability.'" *Id.* (citing *Williams*, 853 F.Supp. at 72 (citing *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 258 (2d Cir. 1991), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992))). "It is in the court's discretion to determine whether or not to deduct the amount of any unemployment insurance received from any damages awarded." *Id.* (citing *Bonura*, 629 F.Supp. 353).

The average increase in salary each year is 6.18%. Therefore, the court determines that the salary for the year 1996–1997 is $18,461 increased by 6.18% which is $19,601.89

9. Since Ms. Brooks has earned $550 per month performing In Home Care from November 24, 1995 through January 24, 1996, the court has determined her income for the remaining 8 months and one week from January 25, 1996 through September 30, 1996 by relying on that figure.

The court is satisfied that Brooks actively sought employment subsequent to her termination and did not receive a "windfall" by collecting unemployment insurance benefits. *See Meschino v. International Tel. & Tel. Corp.*, 661 F.Supp. 254 (S.D.N.Y.1987). Thus, Brooks' award will not be reduced by any unemployment insurance award already collected for the reasoning expressed above.

## 5. *Net Back Pay Due*

As discussed earlier, plaintiff is entitled to prejudgment interest. The following table illustrates the calculation of interest based upon the gross back pay which Brooks would have collected absent discrimination, less the amount which Brooks earned during that time considered.[10]

| Year[11] | Gross Back Pay | − | Interim Earnings | + | Total of Prior Year | = | Total | × | Rate | = | Total with Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1991 | $10,575.00 | $— | | $— | | | $10,575.00 | | 10% | | $11,632.50 |
| 1992 | 14,888.00 | — | | 11,632.50 | | | 26,520.50 | | 7% | | 28,376.94 |
| 1993 | 16,109.00 | 7,169.88 | | 28,376.94 | | | 37,316.06 | | 7% | | 39,928.18 |
| 1994 | 17,422.50 | 14,010.57 | | 39,928.18 | | | 43,340.11 | | 8% | | 46,807.32 |
| 1995 | 18,282.00 | 12,576.84 [12] | | 46,807.32 | | | 52,512.48 | | 9% | | 57,238.60 |
| 1996 [13] | 14,130.98 | 4,950.00 | | 57,238.60 | | | 66,419.58 | | 9%[14] | | 71,068.95 |
| Total | $91,407.48 | $38,707.29 | | | | | | | | | |

Therefore, Brooks is awarded the sum of $71,068.95 as net back pay due from the date of termination to September 30, 1996.

### D. *Reinstatement*

 Finally, as discussed earlier, the court has the authority to reinstate Brooks as a permanent full-time cleaner in the School District. *Sagendorf–Teal*, 904 F.Supp. at 99; 42 U.S.C. § 2000e–5(g). The court finds that such reinstatement is appropriate in order to make the plaintiff whole. Thus, the court orders the defendant to reinstate Brooks as of October 1, 1996 as a full-time permanent cleaner earning the salary and receiving the same benefits as she would have had she not been wrongfully terminated on May 3, 1991.

Accordingly, it is

ORDERED that

1. Plaintiff is awarded the sum of $71,068.95 against the defendant.

2. Plaintiff is further awarded any benefits she would have accrued during her employment to be paid by defendant.

3. Plaintiff be reinstated by the defendant to a position as a full-time permanent cleaner with the Fonda–Fultonville School District as of October 1, 1996.

4. Plaintiff may file and serve an application for attorney's fees and expenses by September 16, 1996; defendant must file and serve a reply by September 30, 1996; the application will be considered on submission of the papers without oral argument.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

Dated: August 30, 1996
Utica, New York.

---

10. Interest rates are based upon the federal short-term underpayment of taxes rates as set forth in 26 U.S.C.A. § 6621 (Supp.1996).

11. Since the school year starts on July 1, six months of salary of the prior year and six months of salary from the current year have been added together where appropriate.

12. This figure is based upon the $11,889.34 salary from Amsterdam Memorial Hospital plus 5 weeks of In Home Care salary.

13. Yearly salary of $18,461 for six months for a total of $9,230.50 and a yearly salary of $19,601.89 from July 1, 1996 through September 30, 1996 for a total of $4,900.48. *See supra* note 8.

14. Nine months at 9%.